UNITED STATES of America,
Plaintiff–Appellee,

v.

Larry KINDER, Defendant–Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

David KINDER, Defendant–Appellant.

Nos. 90–8579, 90–8580.

United States Court of Appeals,
Fifth Circuit.

Oct. 21, 1991.

Linda Gassaway, Waco, Tex. (Court-appointed), for defendants-appellants.

LeRoy Morgan Jahn, Asst. U.S. Atty., San Antonio, Tex., John A. Phinizy, Asst. U.S. Atty., Waco, Tex., for plaintiff-appellee in No. 90–8579.

LeRoy Morgan Jahn, Asst. U.S. Atty., Ronald F. Ederer, U.S. Atty., San Antonio, Tex., John A. Phinizy, Asst. U.S. Atty., Waco, Tex., for plaintiff-appellee in No. 90–8580.

Before THORNBERRY, DAVIS, and WIENER, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

David and Larry Kinder appeal their guilty pleas and sentences for conspiring to possess methamphetamine with intent to distribute. Because both appellants were

sentenced under the harsher of two overlapping penalty provisions, we remand so the district court may resentence according to the rule of lenity. We affirm the district court on all other issues.

## I.

In February 1990, the Texas Department of Public Safety (TDPS), the Waco Police Department, and the Drug Enforcement Agency (DEA) investigated the distribution of methamphetamine around Waco, Texas. They believed that Larry Kinder (Larry) and Sandra Kay Shook were major methamphetamine dealers in the area. A confidential informant had told Officer Floyd Goodwin of the TDPS that Larry was looking for a methamphetamine supplier. The informant also told officer Goodwin that Shook sold methamphetamine and collected the proceeds for Larry but that Larry controlled the operation. According to the informant, Larry sold between eight ounces and one pound of methamphetamine per week in the Waco area.

Working undercover, Officer Goodwin commenced negotiations on February 8, 1990 to sell methamphetamine to Larry. After a few phone calls between Larry, Shook, and Goodwin, Shook went to Goodwin's hotel room. Shook told Officer Goodwin that she took care of most of Larry's "dope business" for him and discussed the possibility of purchasing a quarter-pound of methamphetamine from Goodwin. Goodwin told Shook that the $2,600 offered was not worth his time and declined to sell. Shook told Officer Goodwin that they did not need more because they still had eight ounces of unsold methamphetamine, but that they would be back later in the evening with more money.

A short time later Larry phoned Goodwin to say that he was trying to raise the money to buy a half-pound of methamphetamine. An hour later, however, Shook called Goodwin and told him that they had only $3,400. Goodwin told Shook that he would not break open his one-pound package for that. Shook told Goodwin that

Larry would want at least a half-pound of methamphetamine by the next week.

On February 14, 1990 Officer Goodwin was informed that Larry was "ready to do business" by buying a half-pound. That evening, Larry and his brother David Kinder (David) went to Goodwin's hotel room. Larry told Goodwin that he had not wanted to buy a large amount of methamphetamine the week before "because he had 17 ounces of methamphetamine on the street and had not collected all of the money from the sale of [it]." Larry told Goodwin that he wanted to buy a half-pound now and would possibly want more later. Larry then instructed David to give Goodwin some bundles of money, and informed Goodwin that there was $5,800 in the bundles.

Officer Goodwin then had the informant retrieve the half-pound of methamphetamine from a dresser drawer. Larry told David to test the substance. David did so, first by snorting some and then by injecting some into his arm with a syringe. When Goodwin asked if the methamphetamine was good enough, David nodded his head enthusiastically. Larry instructed David to take the half-pound outside and wait for him (Larry). Officer Goodwin then gave an arrest signal and Larry and David both were arrested.

Larry and David pled guilty to a one-count indictment of conspiring to possess more than 100 grams of methamphetamine with intent to distribute, in violation of 21 U.S.C. §§ 846 and 841(a)(1) (1988).[1] In exchange for the pleas, the government promised not to prosecute appellants for any additional offenses. At the sentencing hearing, the district court denied all of appellants' objections to the Presentence Investigation Report (PSR). The court included the non-charged 17 ounces of methamphetamine, of which Larry had spoken, when calculating the appellants' base offense level. Larry was sentenced to 210 months imprisonment, five years supervised release, a $5,000 fine, and a $50 mandatory assessment. David was sentenced as a career offender to 400 months impris-

**1.** The indictment also charged Sandra Kay Shook, but she is not part of this appeal.

onment, five years supervised release, and a $50 mandatory assessment. These timely appeals followed.

## II.

### A.

Both appellants contend first that the district court relied on insufficient evidence when including the non-charged 17 ounces (481.93 grams) of methamphetamine as relevant conduct. The inclusion of this additional 17 ounces resulted in raising appellants' base offense level from 26 to 30 under U.S.S.G. §§ 2D1.1(a)(3), (c)(7), and (c)(9) (Nov.1989).

■ Information used in sentencing must have some indicia of reliability. U.S.S.G. § 6A1.3(a); *United States v. Vontsteen*, 910 F.2d 187, 190 (5th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 801, 112 L.Ed.2d 862 (1991), *reh'g granted en banc on other grounds*, 919 F.2d 957 (5th Cir.1990). The district court has wide discretion in evaluating the reliability of the information and whether to consider it. *United States v. Angulo*, 927 F.2d 202, 205 (5th Cir.1991). A defendant who objects to the use of information bears the burden of proving that it is "materially untrue, inaccurate or unreliable." *Id.* We review only for clear error the district court's specific factual findings of the quantity of drugs involved. *Id.*

■ Here, the trial court's decision to include the extra 17 ounces was not clearly erroneous. The court adopted the findings of the PSR. The PSR, in turn, related Larry's statement to Goodwin that he (Larry) had 17 ounces of methamphetamine "on the street" as preventing him from having ready cash to buy methamphetamine offered for sale. Appellants argue that this statement is the only evidence of an additional 17 ounces and that the statement is unreliable because it was mere "puffery" on the part of Larry to boost his credibility with Goodwin. The record belies appellants' assertion. Officer Darryl Moore, who worked with Goodwin on the investigation, testified that he had information concerning "multiple ounces" sold by Larry.

Larry's high sales volume is also supported by Goodwin's informant, who told Goodwin that Larry sold from eight to sixteen ounces of methamphetamine a week.

Appellants also argue economics. They argue that if they had 17 ounces of methamphetamine on the street Larry could have easily raised $5,800, the purchase price for one-half pound of the drug. The argument has at least two flaws. First, it assumes that Larry was devoting all of his available cash to this proposed purchase. Second, it assumes that Larry was able to collect on all of his accounts receivable in one week, a formidable task for any businessman. This economic argument is meritless.

■ David also contends separately that no evidence links him to the additional 17 ounces of methamphetamine. He argues further that no evidence was produced that supports a conclusion that he could have foreseen that Larry distributed this additional quantity of drugs.

The district court was entitled to consider "conduct of others in furtherance of the execution of the jointly-undertaken criminal activity that was reasonably foreseeable by the defendant." U.S.S.G. § 1B1.3(a)(1), Commentary, Application Note 1. The additional 17 ounces were connected to the February 14 transaction (to which David clearly participated) because of Larry's explanation as to why he could not consummate the deal on February 8. Moreover, the evidence supported a conclusion that David worked closely with Larry in the conspiracy. David brought the money to the February 14 transaction, tested the drugs, and took possession of the drugs, all on behalf of the conspiracy. The district court was entitled to infer that David knew the extent of the conspiracy and the amounts of methamphetamine being distributed. *United States v. Vela*, 927 F.2d 197, 201 (5th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 214, 116 L.Ed.2d 172.

### B.

■ Appellants next contend that the government violated their plea agreement

not to prosecute them for additional offenses by recommending inclusion of the additional 17 ounces in sentencing. We disagree. The government promised to prosecute only the 269 grams involved in the February 14 transaction, and kept that promise. Inclusion of the other 17 ounces in sentencing is not equivalent to prosecution. *United States v. Rodriguez,* 925 F.2d 107, 112 (5th Cir.1991).

■ Appellants argue in the alternative that their pleas were rendered involuntary by the government's alleged misrepresentation that their base offense level would be based on only 269 grams. This, too, is without merit. The guilty pleas were voluntary because the district court informed both appellants of the maximum possible statutory punishment they faced. *United States v. Pearson,* 910 F.2d 221, 223 (5th Cir.1990), *cert. denied,* — U.S. —, 111 S.Ct. 977, 112 L.Ed.2d 1062 (1991).

### C.

■ Appellants also maintain that the district court's refusal to reduce their base offense levels by two levels for acceptance of responsibility was clearly erroneous. The Guidelines provide that such a decrease is warranted if the defendant "clearly demonstrates a recognition and affirmative acceptance of personal responsibility for his criminal conduct." U.S.S.G. § 3E1.1(a) (Nov.1989). A defendant bears the burden of proving to the district court that he is entitled to the downward adjustment. *United States v. Mueller,* 902 F.2d 336, 347–48 (5th Cir.1990). Our review of the district court's ruling is "even more deferential than a pure clearly erroneous standard." *United States v. Fabregat,* 902 F.2d 331, 334 (5th Cir.1990).

■ Here both appellants have denied their culpability for any criminal conduct beyond the specific offense charged. Lar-

ry initially claimed he was "pressured" into committing the offense and that the purchase money was not derived from prior drug transactions. David denied knowing that Larry planned to purchase methamphetamine on February 14, and also denied testing the drug; he insisted that he was simply "using it." Both appellants continue to deny any involvement in the extra 17 ounces. Thus the district court was entitled to conclude that appellants were not entitled to the reduction for acceptance of responsibility.

### D.

Appellants next contend that they are entitled to reversal because 21 U.S.C. § 841(b)(1) is unconstitutionally vague with respect to the offense of possessing more than 100 grams of a mixture containing methamphetamine.

■ The 1988 edition of the United States Code provided two different penalties for the same offense. Specifically, § 841(b)(1)(A)(viii) provided for a 10–years–to–life sentence if the offense involved at least 100 grams of methamphetamine, or at least *100 grams* of a mixture containing methamphetamine. But subsection (B)(viii) provided for imprisonment of only 5–to–40–years if the offense involved at least 10 grams of methamphetamine, or at least *100 grams* of a mixture containing methamphetamine.[2]

We recently addressed this precise issue and held that the existence of these inconsistent penalties does not render § 841(b)(1) unconstitutionally vague. *United States v. Shaw,* 920 F.2d 1225, 1227–28 (5th Cir.), *cert. denied,* — U.S. —, 111 S.Ct. 2038, 114 L.Ed.2d 122 (1991); *United States v. Harris,* 932 F.2d 1529, 1535–36 (5th Cir. 1991) (relying on *Shaw* ), *cert. denied,* — U.S. —, 112 S.Ct. 270, 116 L.Ed.2d 223. This is so because Congress defined clearly

---

**2.** The duplication was apparently a clerical error. A 1990 amendment entitled "Correction of an Error Relating to the Quantity of Methamphetamine Necessary to Trigger a Mandatory Minimum Penalty" amended subsection (A)(viii) by substituting 1 kilogram (1000 grams) for the 100–gram mixture provision. P.L. No. 101–647, § 1202, 104 Stat. 4830 (Nov. 29, 1990). Thus under the current statute, the harsher penalties of subsection (A)(viii) are triggered only if ten times the quantity of pure methamphetamine or a mixture thereof is involved, as compared to subsection (B)(viii).

the conduct prohibited (possession of 100 grams of a substance containing methamphetamine), and defendants knew they faced imprisonment of at least five years. Thus appellants' constitutional challenge is without merit.

■ This appeal is distinguishable from *Shaw* and *Harris*, however, because the district court in today's case did not apply the rule of lenity. The district court sentenced both appellants under subsection (A)(viii), which carries the more severe penalty. This directly affected David's sentence, raising his offense level under U.S.S.G. § 4B1.1 as a career offender from 34 to 37. This increased David's sentence by at least 73 months.[3] We therefore remand David's sentence so that the district court may resentence under § 841(b)(1)(B)(viii) rather than § 841(b)(1)(A)(viii).

The district court also sentenced Larry under the more stringent provision of (A)(viii). But, because he was not a career offender, Larry's guideline range was the same under (A)(viii) and (B)(viii) at 168–210 months. The district court sentenced Larry to 210 months, the very top of the guideline range. Because the district court sentenced Larry under subsection (A)(viii), which carries a more severe statutory penalty (life) than (B)(viii), we remand Larry's sentence as well so that the district court may reconsider whether it still wishes to sentence Larry at the top of the guideline range.

On remand the district court should also allow the government to point to evidence in the record that the 269 grams of methamphetamine seized on February 14 was at least 37.175% pure, i.e., contained at least 100 grams of pure methamphetamine. If the court so finds, then over 100 grams of pure methamphetamine were involved and the court could properly sentence under penalties of subsection (A)(viii).

### E.

■ Appellants next contend that their sentences are in error because methamphetamine is improperly classified as a Schedule II controlled substance. This argument is without merit.

The Comprehensive Drug Abuse Prevention and Control Act of 1970, 21 U.S.C. §§ 801–970 (the Act), established five schedules of controlled substances and specified the initial classification of substances in each schedule. Section 812(a). Methamphetamine originally was classified as a Schedule III controlled substance. The Act gives the Attorney General the authority to add, remove, or reclassify substances among the schedules pursuant to the procedures and criteria of § 811(a). Appellants maintain that methamphetamine was never properly reclassified to Schedule II because the Attorney General improperly delegated his authority to reclassify. We disagree. The Attorney General properly delegated his authority to the Director of the Bureau of Narcotics and Dangerous Drugs (BNDD) in 1970. 28 C.F.R. § 0.100 (1971). The Director of BNDD then reclassified methamphetamine as a Schedule II substance in 1971. 36 Fed.Reg. 12734. Thus, the Attorney General followed proper procedures in reclassifying methamphetamine as a Schedule II controlled substance. *See United States v. Roark*, 924 F.2d 1426, 1428–29 (8th Cir. 1991); *United States v. Kendall*, 887 F.2d 240 (9th Cir.1989); *United States v. Lane*, 931 F.2d 40 (11th Cir.1991).

■ Appellants also argue that their sentences should have been based on methamphetamine as a Schedule III controlled substance because it was in powder, not liquid form. Although the initial statutory scheme classified methamphetamine as a Schedule II substance only if in injectable liquid form, methamphetamine has since been reclassified as a Schedule II substance even if in powder form. 21 C.F.R. § 1308.12(d) (1989). Appellants' objection, therefore, is without merit.

---

**3.** The Guideline range for Level 34, Category VI is 262–327 months; the range for Level 37 is 360-life. David received 400 months.

## F.

Finally, Larry Kinder contests his two-point enhancement under U.S.S.G. § 3B1.1(c) for being an "organizer, leader, manager, or supervisor" of a criminal activity. Larry contends that his role was no different from the other two participants. He argues that any dominance he had over the others stemmed from his relationship to them (boyfriend to Shook; older brother to David) rather than his role in the activity.

We review only for clear error the district court's finding that Larry was an organizer or leader. *United States v. Sarasti,* 869 F.2d 805, 806 (5th Cir.1989). Officer Moore testified that informants had advised authorities that Larry was in charge of David and Shook. Further, Shook informed Officer Goodwin at their initial meeting that she took care of Larry's dope business for him. At the February 14 transaction, Larry negotiated with Goodwin, instructed David to test the drugs, instructed David to give Goodwin the money, and instructed David to take the drugs outside and to wait for him. Thus the evidence is sufficient to support the district court's conclusion concerning Larry's leadership role.

## III.

We affirm the district court's judgments in all but one respect. Unless the 269 grams of the mixture seized on February 14 contained 100 grams of pure methamphetamine, the district court should have applied the rule of lenity, i.e., sentenced appellants under the more lenient statute. We therefore vacate the sentence and remand this case to the district court to allow it to resentence the defendants accordingly.

The judgment of the district court is AFFIRMED IN PART and REMANDED IN PART for further proceedings consistent with this opinion.