**UNITED STATES of America,
Plaintiff–Appellee,**

**v.**

**Keith Vernon HOSTER, Defendant–
Appellant.**

**No. 92–8223.**

United States Court of Appeals,
Fifth Circuit.

April 7, 1993.

Scott M. Anderson, Dallas, TX, for defendant-appellant.

Mark Stelmach, Richard L. Durbin, Jr., Asst. U.S. Attys., Ronald F. Ederer, U.S. Atty., San Antonio, TX, for plaintiff-appellee.

Before WISDOM,* GARWOOD and HIGGINBOTHAM, Circuit Judges.

GARWOOD, Circuit Judge:

Defendant-appellant Keith Vernon Hoster (Hoster) pleaded guilty to one count of possession, with intent to distribute, of an unspecified amount of amphetamine. He was sentenced under the Sentencing Guidelines both on the basis of the amount of the amphetamine involved in the subject transaction and on the basis of a quantity of a precursor chemical, phenylacetic acid, also involved in the transaction that was treated as conduct relevant to the charged offense. He appeals on various issues. Because the district court miscalculated the effect of the phenylacetic acid on Hoster's base offense level, we reverse and remand. We reject Hoster's other contentions on appeal.

---

* Because of illness, Judge John Minor Wisdom was not present at the oral argument of this case; however, having had available the tape of the oral argument, he participated in this decision.

### Facts and Proceedings Below

On November 14, 1991, Texas Department of Public Safety Narcotic Sergeant Robert Wilkerson and Hill County, Texas, Sheriff's Office Investigator Coy West, working in an undercover capacity, arranged to sell amphetamine and the precursor chemical phenylacetic acid to Hoster and Mark Steven Roberts (Roberts). Hoster had previously negotiated with West over the telephone to purchase one pound of amphetamine and a drum of 110 pounds of phenylacetic acid.

On November 14, Investigator West met Hoster and Roberts at a Diamond Shamrock station in Hillsboro, Texas. Hoster and Roberts arrived at the station independently. Hoster left his vehicle, a white 1990 GMC pickup, and got into West's automobile. After introductions, he gave West a white envelope containing $12,000 in cash,[1] a car title to a 1986 Chevrolet Corvette, and additional papers indicating that Hoster was signing the Corvette over to West.[2] After Hoster paid for the amphetamine and phenylacetic acid, he and West arranged for the transfer of the substances to Roberts, who had been waiting nearby in a 1987 Dodge Shadow.

Roberts, now driving Hoster's GMC pickup, followed West to a Love's Truck Stop in Hillsboro where Sergeant Wilkerson was waiting. West and Roberts entered Wilkerson's vehicle. Upon Roberts' request to see the amphetamine, Wilkerson produced a clear plastic bag containing one pound of amphetamine powder and a set of scales. Roberts examined the texture of the amphetamine and, at the officers' invitation, weighed the package.[3] After indicating that the weight of the amphetamine was acceptable, Roberts declined to inspect the phenylacetic acid, saying "No, let's just throw it in the back of the truck." He took the amphetamine and placed it in the pickup, then returned to Wilkerson's vehicle, presumably to get the drum of phenylacetic acid. At this time, Wilkerson gave a prearranged signal, and Roberts was arrested. The arrest occurred before Roberts unloaded the drum containing the phenylacetic acid from Wilkerson's vehicle.

Hoster had remained behind at the first gas station and did not take part in the events at the Love's station.[4] He was subsequently arrested at another location in Hillsboro.

On December 3, 1991, Hoster was indicted on one count of conspiracy to possess, with intent to distribute, amphetamine, a Schedule II controlled substance. On February 10, 1992, Hoster and the government entered a plea agreement, whereby Hoster agreed to plead guilty to a superseding information in return for the government's agreement to dismiss the indictment.[5] The superseding information charged Hoster with possession, with intent to distribute, amphetamine, and aiding and abetting, all in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.

The plea agreement provided that the government would refrain from prosecuting Hoster for any other Title 21 or 18 offenses of which the government was then aware. In addition, the government agreed to seek a section 5K1.1 reduction at

---

1. Inspector West's testimony at Hoster's sentencing hearing indicated that the price negotiated and paid for the amphetamine was $13,000 instead of $12,000. The government's factual statement at Hoster's rearraignment set the amount at $12,000.

2. According to the affidavit filed with the original criminal complaint in this case, the cash was consideration for the amphetamine, and the title to the vehicle was consideration for the phenylacetic acid. Hoster expressed an intent to use the phenylacetic acid, within the four or five days following this transaction, to manufacture amphetamine, which would in turn be sold for money to redeem his Corvette.

3. Information provided by the Texas Department of Public Safety revealed that the amphetamine weighed 16 ounces and was 65% pure.

4. At the hearing on his guilty plea, Hoster agreed with factual basis as read by the attorney for the government. Although he could not personally verify the events occurring at the Love's site, his attorney indicated that Hoster did not dispute the government's version of those events.

5. Hoster waived his right to be prosecuted by indictment.

sentencing for substantial assistance to authorities.

After a hearing on the plea agreement, the district court accepted the plea and ordered that a presentence investigation report (PSR) be created. In preparing the PSR, the probation officer erroneously classified both the amphetamine and the phenylacetic acid purchased by Hoster on November 14, 1991, as offense conduct, instead of considering the phenylacetic acid as relevant conduct. The PSR calculated Hoster's base offense level by converting both the amphetamine and the phenylacetic acid to a marihuana equivalent and arriving at a base offense level of 34.[6]

In addition, the PSR included as relevant conduct certain events occurring in 1989, when law enforcement authorities executed a search warrant in Johnson County, Texas, and discovered an operating clandestine laboratory. The PSR included 25 pounds of amphetamine, as relevant conduct, based upon an estimate of the amount of amphetamine produced at that laboratory each month. Evidence collected from that search implicated Hoster in the manufacturing of amphetamine at the laboratory. No prosecution resulted from this search.[7]

Hoster objected to the PSR on several grounds. First, he argued that the 1989 events concerning the amphetamine laboratory were not relevant conduct within the meaning of the Guidelines and that inclusion of that information constituted a violation of the government's agreement in the plea bargain agreement not to prosecute Hoster for any other then-known narcotics violations. Hoster also claimed that the factual statement in the PSR which indicated that he had purchased the 110 pounds of phenylacetic acid on November 14 was incorrect, because the phenylacetic acid was never delivered to him or to his co-defendant Roberts, and because "neither of them exercised care[,] custody, or control over that precurser [sic] chemical at any time." He contended that inclusion of the phenylacetic acid also violated the plea bargain agreement, for the same reason as claimed for the 1989 conduct. Hoster further complained that the PSR should have recommended a two point reduction for acceptance of responsibility. Finally, he challenged the PSR's computation of his offense level.[8]

The district court stated its belief that the PSR was correct in considering the 1989 events and in including the 25 pounds of amphetamine as relevant conduct, but nevertheless, "out of an abundance of caution," expressly declined to consider those events in sentencing Hoster. The court did consider the 110 pounds of phenylacetic acid, which were part of the November 14, 1991, transaction, as "relevant conduct." Using the PSR's method of conversion of the 110 pounds of phenylacetic acid, however, the resulting base offense level of 34 would have been the same even had the court included the 25 pounds of amphetamine from the 1989 conduct.

---

6. It is unclear how the probation officer converted the phenylacetic acid. This precursor chemical is not listed in section 2D1.1's Drug Quantity or Drug Equivalency Tables, and the Guidelines do not expressly establish any method for equating it with marihuana or any other controlled substance or immediate precursor.

The government suggests that the probation officer equated the 110 pounds of phenylacetic acid with the same amount of phenylacetone, which unlike phenylacetic acid is listed on the Drug Equivalency Table. One hundred ten pounds, or 49.83 kilograms, of phenylacetone, possessed for a purpose other than the manufacture of methamphetamine, equates with 3,737.25 kilograms of marihuana. Considered either alone or with the 90.6 kilograms of marihuana, the result of the conversion of the amphetamine, this amount results in a base offense level of 34, U.S.S.G. § 2D1.1(c)(5), which is the level recommended by the PSR and adopted by the district court.

7. In addition to Hoster, Roberts and a third person, Jimmy Daniel, were also implicated in the 1989 events.

8. Hoster suggested that the offense level should be based solely on the one pound of amphetamine, which when converted to marihuana according to the Guideline's Drug Equivalency Tables, results in a base offense level of 24. U.S.S.G. § 2D1.1(c)(10); Application Note 10 to § 2D1.1. Hoster then figured in the two point reduction for acceptance of responsibility, resulting in an offense level of 22, which, with his criminal history category of I, provides a punishment range of 41–51 months' imprisonment.

The district court adopted the PSR's calculation of the base offense level as 34, which, with a criminal history category of I, yielded an imprisonment range of 151 to 188 months. The court sentenced Hoster to 170 months' imprisonment and 5 years' supervised release, imposed a fine of $5,000, without interest, and ordered Hoster to pay a special assessment of $50. Hoster filed a timely notice of appeal.

## Discussion

■ We will uphold a sentence imposed under the Sentencing Guidelines so long as it is the result of a correct application of the Guidelines to factual findings that are not clearly erroneous. *United States v. Alfaro*, 919 F.2d 962, 964 (5th Cir.1990).

### I. Relevant Conduct

■ In the plea agreement, the government agreed not to prosecute Hoster for any offense, other than the possession of the sixteen ounces of amphetamine to which Hoster pleaded guilty, of which the government was then aware. Paragraph 7 of the agreement provided:

"In exchange for Defendant's plea, the United States Attorney agrees to refrain from prosecuting Defendant Hoster for other Title 21, and Title 18, United States Code, violations of which the United States is now aware, which may have been committed by the Defendant in the Western District of Texas. That is, this action now pending is the extent of the Federal prosecution against the Defendant in the Western District of Texas based upon all facts at hand."

Hoster complains that the district court's inclusion of the phenylacetic acid as relevant conduct for sentencing purposes violated the government's agreement not to prosecute him for additional offenses.[9]

■ The law of this Circuit holds otherwise. Consideration of relevant conduct in the selection of a defendant's sentence within the range of permissible punishment established by Congress for his offense of conviction is not the equivalent of prosecuting the defendant for an offense additional to his offense of conviction. *United States v. Kinder*, 946 F.2d 362, 367 (5th Cir.1991), *cert. denied*, — U.S. ——, 112 S.Ct. 1677, 118 L.Ed.2d 394 (1992). In *Kinder*, the defendants purchased 269 grams of methamphetamine from an undercover officer. They pleaded guilty to a charge of conspiring to possess more than one hundred grams in exchange for the government's promise not to prosecute them for additional offenses. The district court considered seventeen ounces of methamphetamine referred to by one defendant during the investigation for sentencing purposes. This court held that the inclusion of that additional quantity did not violate the plea bargain. "Inclusion of the other 17 ounces in sentencing is not equivalent to prosecution." *Id. See also United States v. Rodriguez*, 925 F.2d 107 (5th Cir.1991).

The district court did not violate the plea agreement by considering relevant but uncharged conduct in selecting a punishment within the statutory range for the offense of conviction.

■ The district court also did not err in including the phenylacetic acid as conduct relevant to Hoster's offense of possession of one pound of amphetamine.

Guideline section 1B1.3(a)(2) allows the sentencing court to consider, for purposes of calculating a base offense level, "all such acts and omissions that were part of the same course of conduct or common scheme or plan as the offense of conviction." Thus all quantities of drugs involved in a common scheme are considered in reaching the base offense level, even if the defendant is convicted only of distributing or possessing part of the entire quantity. *See* § 3D1.2, Application Note 4, Example (4); *United States v. Mendoza–Burciaga*, 981 F.2d 192, 198 (5th Cir.1992).

It is clear that both the amphetamine and the phenylacetic acid were part of the same course of conduct. Hoster's negotiations

---

9. The PSR included the phenylacetic acid as offense conduct; the district court, however, described it as relevant conduct.

with Investigator West concerned the purchase of both amphetamine and phenylacetic acid, to be paid for and delivered at the same time and place. When Hoster arrived at the Diamond Shamrock station, he paid West for both the amphetamine and the phenylacetic acid. The fact that his co-defendant, Roberts, was arrested before he took actual possession of the phenylacetic acid does not change the fact that the delivery of both substances was to occur at the same time when Roberts met the agents at the Love's station. Both the amphetamine and the phenylacetic acid were part of the same transaction involving the same buyer and seller, occurring at the same time and place. The district court did not err in considering the possession of the 110 pounds of phenylacetic acid as relevant conduct.

## II. Rule 11(c)(1)

■ Hoster contends that the district court failed to advise him of a minimum mandatory sentence before accepting his guilty plea, in violation of FED.R.CRIM.P. 11(c)(1). It is clear from the language of the rule that it pertains only to minimum statutory sentences.[10]

Hoster pleaded guilty to possession of an unspecified amount of amphetamine, with the intent to distribute it, in violation of 21 U.S.C. § 841(a)(1).[11] Subsection 841(b) provides the statutory penalties for violations of subsection (a). For the possession of *any* amount of amphetamine,[12] subsection (b)(1)(C) provides that a defendant

"shall be sentenced to a term of imprisonment of not more than 20 years and if death or serious bodily injury results

from the use of such substance shall be sentenced to a term of imprisonment of not less than twenty years or more than life, a fine not to exceed the greater of that authorized in accordance with the provisions of Title 18, or $1,000,000 if the defendant is an individual or $5,000,000 if the defendant is other than an individual, or both."

As Hoster's offense did not result (and was not alleged to have resulted) in death or serious injury (or, indeed, in any injury), the minimum penalty provisions that the statute does provide are not applicable here, and Hoster does not contend otherwise.

The district court did inform Hoster at the Rule 11 hearing that the maximum possible punishment for possession of amphetamine with intent to distribute and aiding and abetting that possession was twenty years' incarceration followed by at least three and up to five years of supervised release, a fine up to a million dollars, and a fifty dollar mandatory special assessment. Hoster indicated that he understood this.

Hoster seems to argue that the district court should have informed him of a minimum sentence range under the Guidelines. As discussed above, the language of Rule 11(c) concerns only the statutory penalties; the rule certainly does not require the district court to predict the Guideline range applicable to a defendant before accepting a guilty plea and before a PSR is prepared. *United States v. White*, 912 F.2d 754, 756 (5th Cir.), *cert. denied*, 498 U.S. 989, 111 S.Ct. 529, 112 L.Ed.2d 540 (1990).

As the statute provided no mandatory minimum sentence, the district court's ad-

---

**10.** Rule 11(c)(1) provides in pertinent part:
"Before accepting a plea of guilty or nolo contendere, the court must address the defendant personally in open court and inform the defendant of, and determine that the defendant understands, the following:
"(1) the nature of the charge to which the plea is offered, *the mandatory minimum penalty provided by law, if any,* and the maximum possible penalty provided by law, including the effect of any special parole or supervised release term, the fact that the court is required to consider any applicable sentencing guidelines but may depart from

those guidelines under some circumstances...." (Emphasis added.)

**11.** This section makes it unlawful for any person knowingly or intentionally "to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance." Amphetamine is a Schedule II controlled substance. 21 U.S.C. § 812(c).

**12.** The language of the statute includes amphetamine in its description of "a controlled substance in schedule I or II except as provided in subparagraphs (A), (B) and (D)," as none of the exceptions encompass amphetamine.

vice to Hoster was not deficient under Rule 11.[13]

### III. Calculation of Base Offense Level

■ The district court accepted the PSR's calculation of Hoster's offense level. The probation officer considered both the one pound of amphetamine and the 110 pounds of phenylacetic acid as offense conduct. The district court correctly considered the phenylacetic acid as relevant conduct. Apparently, the probation officer converted the phenylacetic acid to phenylacetone, converted the amphetamine and phenylacetone to marihuana using the section 2D1.1 Drug Equivalency Tables, and then added the two amounts of marihuana together to come up with a base offense level of 34. This method of conversion, and the resulting base offense level, was apparently accepted by the district court.

Hoster argues for the first time on appeal that the district court relied on the wrong guideline in calculating the effect of the phenylacetic acid on his base offense level.[14] He contends that for this purpose the court should have looked to section 2D1.11, a new provision, as of 1991, controlling offenses involving precursor chemicals (such as phenylacetic acid), rather than to section 2D1.1, the section governing controlled substance (such as amphetamine) and immediate precursor offenses.[15]

Because he did not raise this issue below, we review the district court's actions only for plain error. *United States v. Surasky*, 974 F.2d 19 (5th Cir.1992), *petition for cert. filed,* (February 1, 1993). Plain error is "error so obvious that [this Court's] failure to notice it would seriously affect the fairness, integrity, or public reputation of [the] judicial proceeding and result in a miscarriage of justice." *Id.* at 21.

In *Surasky*, the defendant pleaded guilty to possession of a listed chemical, phenylacetic acid, with the intent to manufacture a controlled substance, methamphetamine, in violation of 21 U.S.C. section 841(d). The sentencing court adopted the PSR's calculations, which converted the phenylacetic acid possessed by Surasky to phenylacetone and then to methamphetamine according to a formula devised by the Drug Enforcement Administration to arrive at a base offense level of 28. Surasky objected to this manner of figuring his sentence for the first time on appeal; he argued that the district court should have used the Guidelines' Drug Equivalency Table to convert the phenylacetic acid to cocaine or heroin, which would have resulted in an offense level of 26. This Court concluded that, because the Guidelines do not require the use of the Drug Equivalency Tables, the district court did not commit plain error by failing to use them.

The present case differs from *Surasky* in two important aspects. First, and most importantly, Guidelines section 2D1.11 applies to Hoster's sentencing but was not in effect for Surasky's. This section, for the first time in the Guidelines, recognizes offenses involving precursor chemicals such as phenylacetic acid and sets forth offense levels and conversion tables for computing a defendant's sentence. Second, the discrepancy between the offense levels as computed by the district court and the defendant in *Surasky* was a matter of two levels. Here, as will be seen below, we

---

**13.** The government argues that the district court need not have informed Hoster of any minimum mandatory sentence because the superseding information to which he pleaded guilty did not allege a specific quantity of amphetamine. We do not reach this contention, however, in light of our holding that the district court was not required to advise Hoster of any minimum mandatory sentence in this particular case because there is no statutory mandatory minimum sentence for Hoster's offense of possession of one pound (or any other quantity) of amphetamine.

**14.** Hoster did not object at his sentencing hearing to the PSR's method of conversion of the phenylacetic acid to marihuana via phenylacetone, presumably because his contention was that he should be sentenced on the basis of the amphetamine alone.

**15.** Hoster committed the offense to which he pleaded guilty on November 14, 1991. He was sentenced pursuant to the Guidelines on April 15, 1992. Both of these events occurred during the reign of the 1991 amendments to the Sentencing Guidelines, which became effective on November 1, 1991. Hence the new provision, section 2D1.11, applies to Hoster's sentencing.

calculate Hoster's offense level to be 28, six levels lower than the level 34 the district court used.

We conclude that the district court plainly erred in not considering the effect of section 2D1.11 on Hoster's sentence.

■ Seeing the need to consider section 2D1.11 and doing so, however, are two different matters. The Guidelines do not provide an express method for combining section 2D1.11 precursor chemicals with section 2D1.1 controlled substances or immediate precursors where, as here, the presence of the precursor chemical is merely conduct relevant to possession of a controlled substance. The Drug Equivalency Table of section 2D1.1 converts controlled substances and immediate precursors to marihuana; the Chemical Equivalency Table of section 2D1.11 converts precursor chemicals to ephedrine. There is no cross-equivalency table, nor is there any indication elsewhere in the Guidelines as to how quantities of controlled substances and precursor chemical are to be aggregated when relevant conduct is involved.

Further, there are no cases directly on point. Those cases that discuss both sections 2D1.1 and 2D1.11 concern conduct occurring before section 2D1.11 became effective. In addition, these cases generally involve the precursor chemical as offense conduct, e.g., offense of possession of a listed chemical with intent to manufacture a controlled substance, 21 U.S.C. § 841(d), rather than as relevant conduct.[16]

The grouping rules of section 3D1 provide some guidance. Application Note 3 to section 2D1.11 addresses instances when a defendant is convicted of both an offense involving a listed chemical, covered by section 2D1.11, and a related offense involving an immediate precursor or other controlled substance, under section 2D1.1. In such a case, the appropriate procedure is to determine the offense level under each guideline separately and then to group the counts together pursuant to the rules of section 3D1.2(b).

Section 3D1.2(b) allows grouping "[w]hen counts involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan."[17] We note that an offense under section 2D1.1 and another under section 2D1.11 could also, perhaps more properly, be grouped under section 3D1.2(d), which specifically lists the two sections together. Section 3D1.2(d) applies "[w]hen the offense level is determined largely on the basis of … the quantity of a substance involved."

Once multiple counts have been grouped together according to the rules of 3D1.2, the next step is to determine the offense level applicable to each group by applying the rules of section 3D1.3. It is at this step that the difference between grouping pursuant to 3D1.2(b) or 3D1.2(d) becomes evident.

Section 3D1.3(a) governs to determine the offense level for groups formed under section 3D1.2(b). In this case, the offense level applicable to the group is the highest offense level of the counts in the group. In other words, the offense level for each count in the group is determined according to the applicable guidelines, with adjustments as provided by Chapter Three of the

---

16. See United States v. Leed, 981 F.2d 202 (5th Cir.1993) (prior to amendment adding section 2D1.11, section 2D1.1 applied to offense of possession of phenylacetic acid with intent to manufacture amphetamine); United States v. Surasky, 974 F.2d at 19 (defendant pleaded guilty to possession of phenylacetic acid with intent to manufacture methamphetamine); United States v. Voss, 956 F.2d 1007 (10th Cir.1992) (noting that addition of section 2D1.11, although not governing that case because conduct occurred prior to effective date of section, supported finding that section 2D1.1 did not apply to charges of possession of listed chemicals with intent to manufacture), petition for cert. filed (December

7, 1992); United States v. Hyde, 977 F.2d 1436 (11th Cir.1992) (affirming sentence of defendant who pleaded guilty to possession of phenylacetic acid with knowledge that it would be used to manufacture methamphetamine where sentence was based on amount of methamphetamine which could have been produced from the listed chemical), petition for cert. filed, (February 8, 1993).

17. The term "victim," for purposes of drug offenses for which there are no identifiable victims, is the societal interest that is harmed. Section 3D1.2, application note 2.

Guidelines, which are not applicable here; [18] the highest of those levels becomes the offense level for the group.[19]

If offenses are grouped under section 3D1.2(d), however, section 3D1.3(b) provides that the offense level applicable to the group is the offense level corresponding to the aggregated quantity involved in the counts, again with the Chapter Three adjustments, which do not apply here.

Although the Guidelines are not clear about whether offenses (or offenses and relevant conduct) involving sections 2D1.1 and 2D1.11 should be grouped under section 3D1.2(b) or section 3D1.2(d), we determine that the more appropriate method here is under the latter.[20] Section 3D1.2(d) mentions sections 2D1.1 and 2D1.11 explicitly and allows grouping on the basis of the quantity of the substance or substances involved. As this section more narrowly describes this controlled substance case, we look to it for instruction in how to calculate Hoster's base offense level.

Using section 3D1.2(d) creates a problem of how to aggregate the quantities of amphetamine and phenylacetic acid involved. Nowhere do the Guidelines provide a table for equating the precursor chemicals from section 2D1.11 with the immediate precursors and controlled substances of section 2D1.1.[21]

The solution that seems most reasonable to us, which treats the phenylacetic acid as relevant conduct while still allowing its presence to reflect on the seriousness of the offense conduct, is to convert the phenylacetic acid to marihuana by equating the amounts of each that give rise to the same offense level. In other words, Hoster possessed 110 pounds, or 49.89 kilograms, of phenylacetic acid. The Chemical Quantity Table of section 2D1.11 provides a level of 28 for offenses involving 20 or more kilograms of phenylacetic acid. The Drug Quantity Table of section 2D1.1 provides an offense level of 28 for violations involving at least 400 kilograms but less than 700 kilograms of marihuana. Giving the defendant the benefit of lenity, we equate his possession of 49.89 kilograms of phenylacetic acid with possession of 400 kilograms of marihuana, because both yield the same offense level.

We then convert the amphetamine to marihuana according to section 2D1.1's Drug Equivalency Tables and arrive at the figure of 90.72 kilograms of marihuana.[22] Adding the 90.72 kilograms of marihuana from the amphetamine conversion to the 400 kilograms of marihuana from the phenylacetic acid conversion results in a sum of 490.72 kilograms of marihuana. The offense level for this amount of marihuana is 28.

It is purely coincidental that the final offense level of 28 reached by this method is the same as if we had calculated the offense level by considering each substance separately and taking the higher level. The two results need not coincide in other

18. Parts A, B, and C of Chapter Three provide for adjustments based on the type of victim, the defendant's role in the offense, and any obstruction of justice that is present.

19. Were we to group the amphetamine and phenylacetic acid according to the rules of 3D1.2(b), as though they were both counts of conviction, we would calculate the offense level for each and take the higher. The 1 pound, or 453.6 grams of amphetamine, converts to 90.72 kilograms of marihuana and yields a base offense level of 24. Section 2D1.1(c)(10). The 110 pounds, or 49.89 kilograms, of phenylacetic acid results in a base offense level of 28. Section 2D1.11(d)(1). Following 3D1.3(a), the group offense level would be 28.

20. Although Application Note 3 to section 2D1.11 references the grouping rule of section 3D1.2(b), this was in the context of separate offenses under sections 2D1.1 and 2D1.11. Because we are faced here with only a single offense, the grouping rules are not dispositive. We use them only for instruction.

21. The PSR seems to have equated the phenylacetic acid with phenylacetone and then proceeded to convert the phenylacetone and the amphetamine to marihuana. The problem with this approach is that there is nothing in the Guidelines by which one could infer a relationship between phenylacetic acid and phenylacetone.

22. One pound, or 453.6 grams, of amphetamine is the equivalent of 90.72 kilograms of marihuana (453.6 grams $\times$ 200 grams = 90,720 grams, or 90.72 kilograms).

cases involving different amounts or different substances.[23]

Because the district court did not take the new section 2D1.11 into account, and because the offense level of 34 as determined by the district court is significantly higher than the level we reach, the district court plainly erred in assessing Hoster's base offense level.[24]

We remand to the district court for resentencing in accordance with this opinion.

IV. Acceptance of Responsibility

 Finally, Hoster raises, for the first time in his reply brief, that the district court should have reduced his offense level under U.S.S.G. § 3E1.1 for acceptance of responsibility.[25] Ordinarily, we will not consider a new claim raised for the first time in an appellant's reply brief. *United States v. Prince*, 868 F.2d 1379, 1386 (5th Cir.), *cert. denied*, 493 U.S. 932, 110 S.Ct. 321, 107 L.Ed.2d 312 (1989). Even were we to address this issue, we would not disturb the district court's decision. The PSR did

not recommend a reduction for acceptance of responsibility, noting that Hoster had declined to discuss any prior or subsequent drug activities on the advice of counsel. Under the 1991 version of the Guidelines, the version applicable to Hoster's sentencing, the district court did not clearly err in denying a section 3E1.1 reduction.[26]

**Conclusion**

For the reasons stated above, Hoster's conviction is affirmed, but his sentence is vacated and the cause is remanded to the district court for resentencing not inconsistent herewith.

CONVICTION AFFIRMED; SENTENCE VACATED; CAUSE REMANDED FOR RESENTENCING.

---

**23.** An alternate method of converting phenylacetic acid (here 110 pounds or 49.89 kilograms) to marihuana would be the following.

Section 2D1.11 provides a base level of 28 for offenses involving 20 or more kilograms of phenylacetic acid. Section 2D1.1 reveals that the amount of marihuana which produces a level 28 offense level is at least 400 but not more than 700 kilograms. Using the 400 kilogram amount of marihuana, as the most favorable to the defendant, the ratio of 20 kilograms of phenylacetic acid, the lowest amount for level 28 under section 2D1.11, to 400 kilograms of marihuana is 1:20.

Multiplying the 49.89 kilograms of phenylacetic acid involved here by this ratio results in a total of 997.8 kilograms of marihuana (49.89 kilograms of phenylacetic acid × 20 kilograms), which carries a base offense level of 30. Adding in the 90.72 kilograms of marihuana converted from the amphetamine results in a total of 1088.52 kilograms of marihuana. The base offense level for this amount of marihuana is 32.

We rejected this method of conversion because it would punish Hoster's possession of phenylacetic acid, even as related conduct, more seriously as converted to marihuana than if it were calculated solely under the Chemical Quantity Table. The Guidelines establish a maximum culpability level of 28 for the possession of any amount of phenylacetic acid not less than 20 kilograms. Converting the phenylacetic acid to marihuana using the ratio method results in the higher base offense level of 30.

We conclude that the method of conversion fairest to the defendant is to merely equate the phenylacetic acid and marihuana using the offense level rather than figuring in the total amount of phenylacetic acid using the ratio.

**24.** Offense level 28, with Hoster's criminal history category of I, would produce a guideline confinement range of 78 to 97 months.

**25.** Hoster's original brief's passing statement, in connection with a different matter, that he requested below, and that his proper offense level should reflect, a reduction for acceptance of responsibility, unaccompanied by argument or citation of authority, and without any reference thereto in the statement of issues or summary of the argument, plainly does not constitute raising this issue.

**26.** The 1992 version of the Guidelines amends section 3E1.1 by, *inter alia*, eliminating the phrase "a recognition and affirmative" modifying acceptance of responsibility and by substituting "for his offense" in lieu of "for his criminal conduct." It also amends the comments to section 3E1.1 to reflect that a defendant is not required to volunteer or affirmatively admit relevant conduct beyond the offense of conviction in order to be eligible for the reduction. Application Note 1(a) to U.S.S.G. § 3E1.1 (effective November 1, 1992).