**UNITED STATES COURT OF APPEALS**
**for the Fifth Circuit**

_____

No. 91-1434
_____


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS


ROY LEE LEED,

Defendant-Appellant.


_____

Appeal from the United States District Court
for the Northern District of Texas
_____
(January 4, 1993)

Before POLITZ, Chief Judge, GARWOOD and DAVIS, Circuit Judges.

DAVIS, Circuit Judge.

Roy Lee Leed (Leed) appeals his conviction and sentence on charges of possession of a listed chemical with intent to manufacture a controlled substance and conspiracy to commit the same offense. Leed argues primarily that the government produced insufficient evidence to support his conviction. He also argues that the district court erred when it used U.S.S.G. § 2D1.1 in calculating the appropriate sentencing guideline range. We find sufficient evidence to support the jury's verdict and find that the district court correctly applied the sentencing guidelines. We therefore affirm Leed's conviction and sentence.

In August 1990, a confidential informant, Jerry Pierce (Pierce), informed the DEA that John Watkins (Watkins) wished to purchase a 110-pound keg of phenylacetic acid, a federally regulated chemical used in the manufacture of amphetamine and methamphetamine. Pierce then worked under DEA supervision in attempting to negotiate a sale of the chemical to Watkins. Pierce permitted DEA agents to record telephone negotiations he had with Watkins for this purpose. Agents identified John Watkins as the subscriber of the telephone number Pierce called.

On August 17, DEA agents recorded several conversations that failed to produce a definitive agreement. In the first telephone call, Watkins stated that he was interested in making a deal, but that he needed an hour to obtain assistance. During this conversation, Watkins agreed to provide an "eight ball" or a "quarter" of "powder" as a portion of the purchase price. When Pierce telephoned Watkins about one hour later, Watkins stated that he would be ready to make a deal as soon as he heard from "her." Two hours later, Watkins still had been unable to reach his contact. In a later conversation that day, Watkins arranged to go forward with the purchase on Monday, August 20, 1990.

During a conversation on August 20, Watkins expressed relief when Pierce stated that he could deliver a 110-pound keg of the chemical rather than a 55-gallon barrel. During a subsequent conversation in which Pierce and Watkins discussed a meeting place, Watkins stated his concern about some unusual police activity in a

parking lot near his house. After Watkins tested his telephone lines and was satisfied that he was not under surveillance, he agreed to proceed with the deal. In an unrecorded telephone call, Watkins and Pierce agreed that the transaction would take place in the parking lot of a boot store. Watkins agreed to pay $5,500 and to provide "powder" in exchange for the 110-pound keg. Watkins told Pierce to expect an individual in a white-over-gold Cadillac and to wait for the individual to give the signal by wiping his brow. Pierce expected that Watkins would drive the Cadillac.

Later, on August 20, Pierce and DEA agent William Bryant (Bryant) drove to the meeting place in a white cargo van containing the unmarked keg of phenylacetic acid. The phenylacetic acid had a strong, distinctive odor, so strong that it could be smelled outside of the cargo van. The driver of the white-over-gold Cadillac, later identified as Leed, then drove near the cargo van, looked around the parking lot, and wiped his brow with his hand. Pierce and Bryant wiped their brows in reply. Leed exited the Cadillac, approached the cargo van, and handed a plastic grocery bag to Bryant. Leed stated that the bag contained $5,500 and asked Bryant if he wanted to load the phenylacetic acid into the Cadillac. Bryant asked Leed to get inside of the van while he counted the money.

Inside the grocery bag, Bryant found a number of cracker packages and a package wrapped in white freezer paper. Leed stated that he had wrapped the money in the freezer paper to make the package look like a sandwich. Bryant asked Leed if he had brought

any powder with him, but Leed stated that they didn't have any powder "at that time."  Also, when Bryant asked Leed if his people would be interested in making future purchases, Leed replied that "I was just sent here to pick up the package, but I'm sure my people would want to buy all they could get their hands on."  Leed provided Bryant with a knife to cut the package open, and Bryant counted the money.  After Bryant, Pierce, and Leed loaded the phenylacetic acid into the trunk of the Cadillac, Leed was arrested.

DEA agents searched the Cadillac and found a notebook in a briefcase.  The notebook contained the name John and the same phone number that Pierce had used to make telephone calls to John Watkins.  The agents also found a spiral notebook in the briefcase containing a list of things to do, one of which was to call "Pappy" at Watkins' telephone number.

In an attempt to also arrest Watkins, Pierce telephoned Watkins and informed him that no one had come to pick up the phenylacetic acid.  Watkins told Pierce that he would come himself.  When Watkins arrived, he drove alongside the cargo van and stated that he was hunting for a lost sheep.  Bryant stated that he was tired of sitting on the "drum."  Watkins complained that police were all over his neighborhood and suggested that they relocate to a nearby K-Mart store.  Bryant insisted that they complete the transaction in the parking lot.  Bryant asked Watkins if he had any powder, but Watkins said no.  Watkins was then arrested.

4

At the time of his arrest, Watkins possessed a slip of paper reading "73 cad. four door gold-over white" on one side and "Jerry Pierce, white van, BLM30" on the other side. Agents also found a packet containing 1.72 grams of amphetamine with a potency of 93 percent. A strength of 93 percent indicates that the amphetamine came directly from a laboratory.

A grand jury indicted Leed on one count of possession of phenylacetic acid, a listed chemical, with intent to manufacture amphetamine, in violation of 21 U.S.C. § 841(d)(1), and on one count of conspiring to commit the same offense, in violation of 21 U.S.C. § 846. Following trial, the jury found Leed guilty on both counts. Watkins was charged solely with conspiracy, and in a joint trial with Leed, he was found guilty. Leed's motion for judgment of acquittal was denied.

The district court sentenced Leed under U.S.S.G. § 2D1.1 to imprisonment for consecutive terms of 120 months on the conspiracy count and 60 months on the substantive count, three years supervised release, and $100 in special assessments. Leed timely appealed.

II.

A.

Leed contends first that the district court erred in denying his motion for judgment of acquittal, and argues that the evidence is insufficient to support his conviction on either the conspiracy or the substantive offense. To establish a conspiracy under 21 U.S.C. § 846, the government must prove beyond a reasonable doubt

5

(1) an agreement between two or more persons to violate the narcotics laws, (2) that each alleged conspirator knew of the conspiracy and intended to join it, and (3) that each alleged conspirator did participate in the conspiracy. **United States v. Carter**, 953 F.2d 1449, 1454 (5th Cir. 1992), **cert. denied**, 112 S. Ct. 2980 (1992). Although presence at the scene and close association with those involved in a conspiracy are insufficient factors alone, they are nevertheless relevant factors for the jury. **United States v. Simmons**, 918 F.2d 476, 484 (5th Cir. 1990). To establish a violation of § 841(d)(1), the government was required to prove that Leed knowingly possessed the listed chemical with the intent to manufacture amphetamine.

Leed contends first that the government produced insufficient evidence that he had an agreement with Watkins or others to violate the narcotics laws. He argues that the government's failure to produce this evidence is fatal to his conviction on the conspiracy count.

Leed also contends that the record evidence is insufficient to support either a finding that he knowingly possessed phenylacetic acid or a finding that he had any intent to manufacture amphetamine. We agree with Leed that his conviction cannot stand on either count unless the government's proof is sufficient to support both of these implicit findings.

We review the district court's denial of a motion for judgment of acquittal **de novo**. **United States v. Sanchez**, 961 F.2d 1169 (5th Cir. 1992), **cert. denied**, 113 S. Ct. 330 (1992). In

6

deciding whether the evidence is sufficient to support Leed's convictions,

> it is not necessary that the evidence exclude every reasonable hypothesis of innocence; we review the evidence in the light most favorable to the government, drawing all reasonable inferences in support of the verdict, and will affirm the conviction if a rational trier of fact could have found that the evidence established each essential element of the offense beyond a reasonable doubt.

**United States v. Stone**, 960 F.2d 426, 430-31 (5th Cir. 1992).

B.

We first turn to Leed's argument that the government failed to produce sufficient evidence that he had an agreement with Watkins to violate the narcotics laws. We find no merit to this argument. Ample evidence demonstrates an agreement between Leed and Watkins to procure the phenylacetic acid. First, Leed obviously obtained all the details of the transaction from Watkins. Leed knew the location of the proposed exchange; he knew which vehicle to look for; he knew the signal; and he knew the purchase price.

Second, agents found evidence in the Cadillac that affirmatively linked Leed to Watkins. This included a notebook in a briefcase containing the name "John" and Watkins' phone number. The agents also found a spiral notebook in the briefcase. One of the things to do listed in the notebook was to call "Pappy" at Watkins' phone number.

Finally, Leed also knew that the transaction was a covert operation. He looked around the parking lot before identifying himself with the pre-arranged signal. He also wrapped the $5,500 cash in freezer paper to disguise its appearance.

7

The evidence strongly supports the jury's implicit finding that Leed agreed to assist Watkins in purchasing a listed chemical for an illicit purpose.

C.

After a careful review of the record, we also conclude that the record evidence supports the jury's implicit finding beyond a reasonable doubt that Leed knowingly possessed the phenylacetic acid with the intent to manufacture amphetamine.

Leed asserts first that during his meeting with Bryant and Pierce in the parking lot, no one mentioned anything about the contents of the keg. He argues that the keg was not labeled and that it resembled a barrel containing pool chemicals. Leed points also to the lack of evidence that he had any training which would have enabled him to recognize the pungent odor of phenylacetic acid.

Ample evidence supports the finding that Leed knew the contents of the keg. As indicated above, Leed knew that this was a covert operation. When he arrived in the parking lot to pick up the chemical, Leed carefully looked around and signalled his identity by wiping his brow. He personally wrapped the $5,500 purchase price in freezer paper so that it would look like a sandwich. Leed's secret signals and his delivery of cash disguised as a sandwich in a lunch bag belie any intent by him to purchase pool chemicals. Also, Leed made no remark about the overpowering odor of the phenylacetic acid when he entered the van with Bryant and Pierce. Then, when asked about "powder," Leed responded that

8

they had none at that time. Leed's behavior in the parking lot, his delivery of $5,500 cash to Pierre and the agents, and his response to questions about "powder," support an inference that he knew that the keg contained phenylacetic acid.

Leed's final sufficiency argument is his strongest. He challenges the sufficiency of the evidence to support a finding that he had any intent to manufacture amphetamine. Leed argues that this Court has required some evidence of a laboratory or specific statements by the defendant to show intent to manufacture amphetamine. **See, e.g.**, **United States v. Stone**, 960 F.2d 426 (5th Cir. 1992). Citing **United States v. Berkery**, 919 F.2d 817, 821 (2nd Cir. 1990), he argues that one instance of possession of phenylacetic acid is insufficient to support an inference that he specifically intended to manufacture amphetamine. He reads the Second Circuit's opinion in **Berkery** as holding that possession of a large quantity of phenyl-2-propanone (P2P) leads just as naturally to the conclusion that the defendants intended to distribute that chemical, rather than use it in a manufacturing scheme. **See id.**

Our analysis of this record leads us to conclude that sufficient evidence exists to support an inference that Leed knew of and intended to further the goals of a manufacturing operation. As we discussed above, Leed's conduct demonstrates his knowledge that the keg of phenylacetic acid was destined for some illegal use. The covert nature of the meeting to exchange the purchase price for the chemicals and the amount of the purchase price

9

adequately demonstrate Leed's knowledge of the illegality of the transaction.

As to the purpose of the transaction, Leed's co-conspirator, Watkins, led Pierce to believe that he was planning to use the acid to manufacture amphetamine; Watkins originally agreed to exchange "powder" in addition to cash for the phenylacetic acid. Indeed, Leed himself implied that their inability to produce "powder" in exchange for the phenylacetic acid was temporary; he told Pierce and agent Bryant that they had no powder "at that time." Also when Bryant asked him whether his people would be interested in making future purchases, Leed replied that "I was just sent here to pick up the package, but I'm sure my people would want to buy all they could get their hands on." His certainty about his accomplices' plans supports a jury inference that he knew the details of the operation and that he was more than an errand boy. His statements also support an inference that he and his accomplices were involved in a pattern of purchasing activity, and that the purpose in purchasing the chemical was to manufacture amphetamine.

Also, when Leed's co-conspirator Watkins was arrested, he possessed a small quantity of almost pure amphetamine. The jury was entitled to conclude that Watkins obtained such uncut amphetamine directly from a laboratory.

Despite this affirmative evidence indicating that Leed knew the acid was to be used to manufacture amphetamine, Leed presented no contradictory evidence that he and Watson intended to use the acid for any other purpose. Leed did not produce evidence that he

10

and Watson acted as brokers of phenylacetic acid or that such a brokerage business is one that rational individuals consider profitable enough to offset the obvious risks. To obtain a conviction, the government need not exclude every hypothesis of innocence to withstand an attack on sufficiency grounds. The jury was entitled to conclude that the most likely use Leed and Watkins planned for this chemical was to manufacture amphetamine. "What a jury is permitted to infer from the evidence in a particular case is governed by a rule of reason, and juries may properly use their common sense in evaluating that evidence." **United States v. Villasenor**, 894 F.2d 1422, 1425 (5th Cir. 1990) (quoting **United States v. Henry**, 849 F.2d 1534, 1536 (5th Cir. 1988). We find that the evidence supports an inference that Leed intended to possess the phenylacetic acid to further the manufacture of amphetamine.

For the reasons stated above, we conclude that the evidence is sufficient to support Leed's conviction.

III.

Leed argues next that the district court incorrectly applied the Sentencing Guidelines.[1] We review challenges to the district court's application of the Sentencing Guidelines **de novo**. **United States v. Shell**, 972 F.2d 548 (5th Cir. 1992).

Leed argues that the district court erred when it applied U.S.S.G. § 2D1.1 in calculating his guideline range and determining his sentence. We disagree. Section 2D1.1 has the following

---

[1] All citations to the Guidelines are to the 1990 Guidelines Manual, in effect when Leed was sentenced in April 1991.

11

heading: "Unlawful Manufacturing, Importing, Exporting, or Trafficking (Including Possession with Intent to Commit These Offenses)." We agree with the Ninth Circuit in **United States v. Cook**, 938 F.2d 149, 152 (9th Cir. 1991) that this guideline specifically applies to the offenses for which Leed was convicted. In other words, the parenthetical in the heading modifies all of the activities that precede it, including manufacturing. **See United States v. Voss**, 956 F.2d 1007, 1014 (10th Cir. 1992) (Abel, J., dissenting). As Judge Abel observed in his **Voss** dissent, "'[p]ossession with [i]ntent' must also refer to possession of chemicals with intent to manufacture." **Id.** Any doubt about the application of § 2D1.1 to Mr. Leed's § 841(d)(1) conviction is dispelled by the statutory index to the Guidelines. That index matches a conviction for § 841(d) with § 2D1.1. **See also United States v. Kingston**, 922 F.2d 1234, 1238 (6th Cir. 1990), **cert. denied**, 111 S. Ct. 2054 (1991) (applying § 2D1.1 to § 841(d) offenses in light of federal effort to block drug distribution efforts at the earliest possible moment).

Relying on the panel majority in **United States v. Voss**, 956 F.2d at 1009-13, Leed makes two arguments in an attempt to avoid the application of U.S.S.G. § 2D1.1. We are unconvinced. Leed argues first that § 2D1.1 does not apply because the statutory index cross-referencing § 841(d) to § 2D1.1 was written before the current version of § 841(d) was enacted. But when the current version of § 841(d) was enacted, the cross-reference to § 2D1.1 in the statutory index remained in place. The Sentencing Commission

12

certainly knew how to change the statutory index if it wished to do so.

Leed also points out that recent amendments to the Guidelines, effective November 1991, have added § 2D1.11 to expressly address possession of listed chemicals. He argues that this amendment demonstrates that the Commission never intended § 2D1.1 to apply to violations of § 841(d). As we explain above, we are persuaded that § 2D1.1 directly applies to § 841(d)'s prohibited conduct--possession of a listed chemical with intent to manufacture amphetamine. But, even if it does not, it was certainly the most analogous guideline when Leed was sentenced. As the majority in **United States v. Voss** acknowledges, § 2D1.11 is a substantive, rather than a clarifying, amendment and does not apply to conduct committed before its adoption. **Voss**, 956 F.2d at 1011.

The district court did not err in applying § 2D1.1 to Leed's offenses.

AFFIRMED.

13