

1994 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-28-1994

# United States v. Bogusz

Precedential or Non-Precedential:

Docket 92-5575

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1994

Recommended Citation

"United States v. Bogusz" (1994). *1994 Decisions.* Paper 229.
http://digitalcommons.law.villanova.edu/thirdcircuit_1994/229

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1994 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

—————————

No. 92-5575

—————————

UNITED STATES OF AMERICA,
                    Appellee

v.

DONALD BOGUSZ, a/k/a Bogey,
                    Appellant

(D.C. Criminal Action No. 91-00401-4)

—————————

No. 92-5595

—————————

UNITED STATES OF AMERICA,
                    Appellee

v.

JOHN O'ROURKE, a/k/a Hap,
                    Appellant

(D.C. Criminal Action No. 91-00401-7)

—————————

Appeal from the United States District Court
for the District of New Jersey

—————————

Argued:  August 9, 1994

PRESENT:  HUTCHINSON and NYGAARD, Circuit Judges,
          and LUDWIG, District Judge*

(Filed  December 28, 1994)

—————————

—————————

*  Hon. Edmund V. Ludwig, United States District Judge for the

Eastern District of Pennsylvania, sitting by designation.

Glenn A. Zeitz, Esquire                    (Argued)
Julia S. Ingersoll, Esquire
Zeitz & Talty
Suite 2628
1700 Market Street
Philadelphia, PA      19103
          Attorneys for Appellant Donald Bogusz

Dennis A. Durkin, Esquire
David D.F. Lawrence, Esquire          (Argued)
Durkin & Durkin
Suite 1700
Gateway One
Newark, NJ      07102-5311
          Attorneys for Appellant John O'Rourke

Michael Chertoff, Esquire
Edna B. Axelrod, Esquire
Leslie F. Schwartz, Esquire          (Argued)
Office of United States Attorney
Room 502
970 Broad Street
Newark, NJ      07102
          Attorneys for Appellee

_____

OPINION OF THE COURT
_____


HUTCHINSON, Circuit Judge.


          Appellants, Donald Bogusz ("Bogusz") and John O'Rourke ("O'Rourke"), appeal criminal sentences imposed on them by the United States District Court for the District of New Jersey.[1] The district court sentenced Bogusz to 120 months and O'Rourke to 168 months of imprisonment for their criminal involvement with a

_____

[1].  O'Rourke also appeals his conviction.  In that respect, he argues:  (1) that the district court erred in refusing to sever his trial from his co-defendants and (2) that the variance between the proof at trial and the indictment unduly burdened him.  Upon review, we hold that these issues lack merit.

methamphetamine laboratory. Because the district court erroneously interpreted the United States Sentencing Guidelines (the "Guidelines"),[2] it miscalculated Bogusz's and O'Rourke's sentences. Therefore, we will vacate both their sentences and remand for resentencing.

## I. Background

Because this appeal focuses on sentencing, only a summary of the facts material to the sentencing issues is needed. On August 29, 1991, a federal grand jury returned an indictment against twelve individuals, including Bogusz and O'Rourke, charging them with participation in a scheme to manufacture and distribute methamphetamine. Bogusz located and obtained glassware and phenylacetic acid, a methamphetamine precursor, for the methamphetamine production process. O'Rourke served as a "plumber." In that capacity, he unclogged drains that became blocked during the methamphetamine manufacturing process.

Bogusz and O'Rourke received methamphetamine as part of the consideration for their services. O'Rourke received four of the eight pounds of methamphetamine produced while he worked on the pipes and Bogusz got one pound. The methamphetamine produced was described as "sticky" and "like caramel" indicating its poor quality. In fact, Bogusz gave half of his methamphetamine to a

---

[2]. Unless otherwise stated, all references to the Guidelines are to the 1991 version, the Guidelines in effect at the time of the appellants' sentencing. See 18 U.S.C.A. § 3553(a)(4) (West 1985).

co-conspirator and returned the other half because of its poor quality.

On March 17, 1992, Bogusz pled guilty under a plea agreement to a conspiracy to distribute more than two pounds of phenylacetic acid, a listed chemical, knowing that it would be used to manufacture methamphetamine, a controlled substance, in violation of 21 U.S.C.A. § 841(d)(2) (West Supp. 1994). On May 14, 1992, after a jury trial, O'Rourke was convicted of a conspiracy to manufacture methamphetamine with intent to distribute in violation of 21 U.S.C.A. § 846 (West Supp. 1994) and possession with intent to distribute in excess of one kilogram of methamphetamine in violation of 21 U.S.C.A. § 841(a)(1) (West Supp. 1994).

At Bogusz's sentencing, the district court adopted a recommendation in the probation office's Presentence Report (the "PSR") to apply a higher base offense level than the one stipulated in Bogusz's plea agreement. Bogusz and the government had stipulated to a base offense level of 24, applying U.S.S.G. § 2D1.11(d)(3); but the PSR recommended applying U.S.S.G. § 2D1.1 with a base offense level of 34. Using a cross-reference from section 2D1.11(c)(1) to section 2D1.1, the district court decided the base offense level was 34. Because phenylacetic acid is not included in section 2D1.1's Sentencing Table, use of section 2D1.1 required conversion of the phenylacetic acid quantities to those of a substance on the table. The probation officer preparing the PSR converted the eight pounds of phenylacetic acid

to two pounds of methamphetamine, the amount of methamphetamine produced from the phenylacetic acid.

The PSR also recommended that sentencing be based upon "methamphetamine (actual)" as opposed to "methamphetamine."[3] The base offense level for two pounds of methamphetamine (actual) under section 2D1.1 was 34. U.S.S.G. § 2D1.1(c)(5) (Drug Quantity Table). This ultimately resulted in Bogusz's 120-month sentence. Sentencing under section 2D1.11(d)(3), with its base level of 24, in accord with the stipulation in the plea agreement, would have resulted in a sentencing range of 51 to 63 months. See U.S.S.G. Ch. 5, Pt. A (Sentencing Table). Applying a two level reduction for acceptance of responsibility and a criminal history category of III to this offense level, the Guidelines indicated that Bogusz should be sentenced to 151 to 188 months of imprisonment. Id. Because the statutory maximum sentence under 21 U.S.C.A. § 841(d) is 120 months, the district court sentenced Bogusz to 120 months. See U.S.S.G. § 5G1.1(a) ("Where the statutorily authorized maximum sentence is less than the minimum of the applicable guideline range, the statutorily authorized maximum sentence shall be the guideline sentence."); see also United States v. Donley, 878 F.2d 735, 741 (3d Cir. 1989) ("the underlying statute shall control in case of conflict with the Sentencing Guidelines"), cert. denied., 494 U.S. 1058 (1990).

---

[3]. Section 2D1.1 subjects methamphetamine (actual) to a more severe base offense level. What the phrase methamphetamine (actual) means is an issue in these appeals which we discuss infra in Part III-A.

At O'Rourke's sentencing, the district court again adopted the PSR's recommendation to apply U.S.S.G. § 2D1.1 and again decided that the methamphetamine was methamphetamine (actual). Based on the eight pounds of methamphetamine produced when he worked on the pipes, O'Rourke received a base offense level of 38, see U.S.S.G. § 2D1.1(c)(3), but the district court granted O'Rourke a four point offense level reduction for his mitigating role. See U.S.S.G. § 3B1.2(a). Using a criminal history category of II and an offense level of 34, the Guidelines put O'Rourke in a sentencing range of 168 to 210 months imprisonment. See U.S.S.G. Ch. 5, Pt. A (Sentencing Table). O'Rourke was sentenced to concurrent sentences of 168 months imprisonment on each count. Both Bogusz and O'Rourke filed timely notices of appeal.

## II. Jurisdiction and Standard of Review

The district court had subject matter jurisdiction over these criminal cases pursuant to 18 U.S.C.A. § 3231 (West 1985). We have appellate jurisdiction over this consolidated appeal under 28 U.S.C.A. § 1291 (West 1993) (review of final decisions) and 18 U.S.C.A. § 3742 (West 1985) (review of sentences).

Under the Guidelines, we review a district court's findings of fact for the limited purpose of determining whether they are clearly erroneous. United States v. Miele, 989 F.2d 659, 663 (3d Cir. 1993); United States v. Belletiere, 971 F.2d 961, 964 (3d Cir. 1992); see also 18 U.S.C.A. § 3742(e) (West Supp. 1994) (reviewing courts "shall accept the findings of fact

of the district court unless they are clearly erroneous").
Findings of fact are clearly erroneous when "the reviewing court
on the entire evidence is left with the definite and firm
conviction that a mistake has been committed." United States v.
U.S. Gypsum Co., 333 U.S. 364, 395 (1948). Findings involving
mixed questions of law and fact are subjected to a more demanding
scrutiny "approaching de novo review as the issue moves from one
of strictly fact to one of strictly law." Belleteire, 971 F.2d
at 964 (quoting United States v. Murillo, 933 F.2d 195, 198 (3d
Cir. 1991)). When the essential facts are not in dispute, our
review of the district court's interpretation of the Guidelines,
like our review of a statute's interpretation, is plenary. See
United States v. Rosen, 896 F.2d 789, 790-91 (3d Cir. 1990). We
must, however, defer to the Sentencing Commission's
interpretation of the Guidelines unless "it violates the
Constitution or a Federal Statute, or is inconsistent with, or a
plainly erroneous interpretation of, that [provision]." Stinson
v. United States, 113 S. Ct. 1913, 1915 (1993).


## III.  Discussion

        Bogusz raises four challenges to the district court's
sentences. O'Rourke joins with him in two. First, both contend
that the district court erred in finding the unanalyzed
methamphetamine, upon which their sentencing was based, to be
methamphetamine (actual). Second, both argue that the district
court erred in tacitly finding that the methamphetamine was
Dextro-methamphetamine ("D-methamphetamine") as opposed to Levo-

methamphetamine ("L-methamphetamine"). Third, Bogusz argues that U.S.S.G. § 2D1.1 does not apply to violations of 21 U.S.C.A. § 841(d)(2) (West Supp. 1994), and that U.S.S.G. § 2D1.11 is the only Guidelines provision applicable to this offense. Fourth, Bogusz contends that the government is violating its plea agreement with him by arguing for affirmance of the district court's sentence. We will address each challenge in turn.

### A.  Guidelines' Treatment of Methamphetamine

To apply U.S.S.G. § 2D1.1, a sentencing court must first determine whether the substance in question is methamphetamine or methamphetamine (actual). This determination involves two related issues. We must first consider whether the methamphetamine that Bogusz and O'Rourke helped produce was "pure" methamphetamine, a necessary condition for its classification as methamphetamine (actual), and then the more complex question of whether the government must also prove that the substance is D- or L-methamphetamine.

### 1.  Methamphetamine (Actual)

The difference between methamphetamine and methamphetamine (actual) is highly significant for sentencing purposes:  methamphetamine (actual) is subject to an offense level ten times greater than methamphetamine. See U.S.S.G. § 2D1.1, comment.(n.10) (Drug Equivalency Table) (one gram of methamphetamine (actual) is treated as the equivalent of ten grams of marijuana while one gram of methamphetamine is

equivalent to one gram of marijuana); see also United States v. Lande, No. 94-8038, 1994 WL 627425, at *5 n.1 (10th Cir. Nov. 9, 1994); United States v. Carroll, 6 F.3d 735, 744 (11th Cir. 1993) (discussing the effect on sentencing) (citing United States v. Brown, 921 F.2d 785, 789 & n.2 (8th Cir. 1990)), cert. denied sub. nom., Jessee v. United States, 114 S. Ct. 1234 (1994).

The district court defined methamphetamine (actual) as "pure methamphetamine."[4]  The court then explained:

> Well, pure is how you define "pure." I'm defining it, "pure," as uncut product, not whether the product was good product or bad product.  Now that may be erroneous, in which case I'll be reversed on appeal.  But the fact of the matter is that a caramel-like mess to me is not the critical point; the point is, that's what came out of the manufacturing process, and it had not yet been cut.

Bogusz Appendix at 85.  Bogusz and O'Rourke argue that methamphetamine (actual) refers to the percentage purity of the end product.  That is, they argue that methamphetamine (actual) refers to the net amount of methamphetamine hydrochloride present in the substance upon which sentencing is based.

The Guidelines' commentary defines methamphetamine (actual) as "the weight of the controlled substance, itself, contained in the mixture or substance."  U.S.S.G. § 2D1.1(c), comment.(n.*).[5]  The Guidelines also provide the following

---

[4].  Prior to the 1991 amendments, the Guidelines also used the term pure instead of actual. See U.S.S.G. App. C., amend. 395.

[5].  In this respect, the Guidelines' treatment of methamphetamine and PCP is contrary to the gross weight method of calculating the

illustrative example: "a mixture weighing 10 grams containing PCP at 50% purity contains 5 grams PCP (actual)." Id. (under the Guidelines, PCP and methamphetamine are treated identically).

Unfortunately, the commentary to the Guidelines is susceptible to either interpretation of "pure," and each has case law support. Compare United States v. Macklin, 927 F.2d 1272, 1282 (2d Cir.) (holding that "pure" merely means uncut or unadulterated), cert. denied, 112 S. Ct. 146 (1991); United States v. Patrick, 983 F.2d 206 (11th Cir. 1993) (same in dicta) with Carroll, 6 F.3d at 746 ("the only way to calculate the quantity of 'pure methamphetamine' in determining a defendant's base offense level under § 2D1.1(c) is to multiply the purity of the mixture times the weight"), cert. denied sub. nom., Jessee v. United States, 114 S. Ct. 1234 (1994); United States v. Rusher, 966 F.2d 868, 880 (4th Cir.) (same), cert. denied, 113 S. Ct. 351 (1992); United States v. Alfeche, 942 F.2d 697, 699 (9th Cir. 1991) (same); United States v. Brown, 921 F.2d 785, 789-90 (8th Cir. 1990) (same); see also United States v. Spencer, 4 F.3d 115, 122 (2d Cir. 1993) (noting that pure methamphetamine does not include the weight of impurities).

At oral argument, the government argued that adoption of the appellants' interpretation would reward them for being "poor cooks." Transcript of Oral Arguments at 46. This contention reflects a fundamental misunderstanding of
(..continued)
quantity of all other controlled substances. See Chapman v. United States, 111 S. Ct. 1919, 1926 (1991). The gross weight method is known as a "market oriented approach." Id. at 1925.

methamphetamine production and the Guidelines' treatment of it. Sentencing for methamphetamine drug offenses is intended to punish all cooks equally. Sentencing under methamphetamine (actual) punishes particularly good cooks and their employers more severely. Methamphetamine, as produced through normal chemical processes, contains a number of impurities. See Spencer, 4 F.3d at 121 (noting that methamphetamine results from a "chemical reaction which yields a mixture of methamphetamine and various impurities"); United States v. Stoner, 927 F.2d 45, 47 (1st Cir.) (noting that methamphetamine "virtually never is completely pure"), cert. denied, 112 S. Ct. 129 (1991). The initial product can then be processed further to remove these impurities. The purified product, being more concentrated, can then be cut into larger quantities for resale. The interpretation Bogusz and O'Rourke urge on us does not reward bad cooks; instead, it merely punishes more severely the sophisticated cooks who could otherwise manipulate the Guidelines by producing smaller quantities of more concentrated methamphetamine.

The government's reliance on Chapman v. United States, 111 S. Ct. 1919, 1925 (1991), and its discussion of Congress' "market-oriented" approach is also misplaced. As the Supreme Court noted in Chapman, Congress and the Guidelines identified methamphetamine and PCP as drugs warranting differential treatment with regard to purity and thus provided for their unique sentencing scheme. See id. at 1924. An interpretation of purity that relies upon the treatment of other controlled

substances conflicts with the Guidelines' unique treatment of methamphetamine.

After consideration of the text and commentary of the Guidelines, existing case law and the peculiar sentencing scheme for methamphetamine, we hold that methamphetamine (actual) refers to the net amount of methamphetamine hydrochloride produced and not the gross amount of uncut methamphetamine. Thus, methamphetamine (actual) refers to the net amount of methamphetamine hydrochloride after all impurities, waste, by-products, or cutting agents are removed.

The government argues that Bogusz and O'Rourke did not show that the methamphetamine "contained a cutting agent, waste product, or any substance other than the controlled substance itself." Brief of Appellee at 46. In essence, the government is arguing that defendants bear the burden of showing the portion of the substance that is not methamphetamine (actual). This argument fails. Although the purity of a methamphetamine product does not bear on a defendant's guilt or innocence and, thus, does not invoke the "beyond a reasonable doubt" standard of In re Winship, 397 U.S. 358, 360 (1970), it does have a profound effect on the sentence imposed, and the government bears the burden of proving it, albeit by only a preponderance of the evidence. See United States v. Miele, 989 F.2d 659, 663 (3d Cir. 1993).

In some situations, a chemical analysis of the substance that indicates its purity may be required for the government to meet this burden. In others, circumstantial evidence of purity may be sufficient. We hold only that the

government must produce evidence of the quantity of methamphetamine hydrochloride the mixture in question contains if a defendant is to be sentenced under U.S.S.G. § 2D1.1 for methamphetamine (actual).

In this case, some of the evidence produced at trial supports the district court's tacit finding of 100% purity. Trial testimony showed that the defendants were in possession of a functional recipe, proper equipment, and requisite chemicals. There was, however, other evidence on the color and consistency of the product which indicated poor quality and could have supported a finding of impurity. Manufactured methamphetamine is not 100% pure regardless of the sophistication of the equipment. Therefore, the government cannot rely solely on the nature of the production process and assume that the total product is pure methamphetamine which calls for sentencing under methamphetamine (actual). Instead, we think there should be a finding, based on evidence, on how much methamphetamine hydrochloride is included in the mixture that constitutes the end product. Because the district court failed to make such a finding, we will remand for further fact finding on the purity of the product.[6]

---

[6]. It has sometimes been suggested that giving the government a second chance to make the requisite showing that it was unable to achieve originally is inconsistent with the Double Jeopardy Clause of the Fifth Amendment. This Court, however, has held that "sentencing proceedings are not . . . so trial-like as to implicate the Double Jeopardy Clause." Wilmer v. Johnson, 30 F.3d 451, 458 (3d. Cir.), cert. denied, 63 U.S.L.W. 3347 (U.S. Oct. 31, 1994) (No. 94-5891); see also Caspari v. Bohlen, 114 S. Ct. 948, 957 (1994) (refusing to decide this issue).

## 2. Organic Composition

On the second aspect of methamphetamine sentencing, both Bogusz and O'Rourke challenge the district court's tacit assumption that the methamphetamine was D-methamphetamine as opposed to L-methamphetamine.  The two are grossly different in physiological effect and, as we shall see, this difference is reflected in the Guidelines drug equivalency tables by a factor of 250 to 1.  An initial failure of the parties to appreciate the chemistry involved and thus to inform the district court of the scientific basis for this contention requires us to consider whether Bogusz and O'Rourke have waived any issue regarding the distinction between D-and L-methamphetamine.  Discussion of the principles of organic chemistry that underlie this issue is necessary before the problem created by the distinction between D- and L-methamphetamine can be understood.  See United States v. Ammar, 714 F.2d 238, 261-64 (3d Cir.) (pre-Guidelines case discussing chemical difference between D- and L-heroin), cert. denied sub nom. Stillman v. United States, 464 U.S. 936 (1983).

The methamphetamine molecule, like most organic molecules, exists in different "isomeric" forms.  Isomers "are compounds that have the same molecular formula but different structural formulas."  Harold Hart, Organic Chemistry: A Short Course 15 (6th ed. 1983) ("Organic Chemistry Text").  Just as people are either right- or left-hand dominant, a molecule can sometimes exist in right- and left-handed forms.  See Organic Chemistry Text at 125-26; Roger A. Hegstrom & Dilip K. Kondepudi, The Handedness of the Universe, Scientific American, Jan. 1990,

at 108 ("Hegstrom & Kondepudi Article"); <u>United States v.</u>
<u>Patrick</u>, 983 F.2d 206, 209 (11th Cir. 1993).  A molecule "that
exhibits the property of handedness" is called a chiral
molecule.[7]  The two forms of the chiral molecules are called
enantiomers.[8]

Each enantiomer is labelled either Dextro or Levo, or D
or L.  Hegstrom & Kondepudi Article at 109.  The difference is
determined by the optical rotation of light.  D is right-handed
and L is left-handed.  One is the mirror image of the other; that
is, they are mirror symmetrical.  <u>Id.</u>  Although enantiomers only
differ with respect to chirality, the human body "is highly
sensitive to enantiomeric differences."  <u>Id.</u>   For example, the
thalidomide birth defects of the 1960's resulted because one
enantiomer of thalidomide stopped morning sickness while the
other caused birth defects.  <u>Id.</u> at 109-10.[9]

---

[7].  Chirality was discovered in 1847 by Louis Pasteur.  <u>See</u>
Hegstrom & Kondepudi Article at 108; Organic Chemistry Text at
127.

[8].  Thus, enantiomers are isomers that are not identical with
their mirror image; that is, the enantiomers are
nonsuperimposable.  Organic Chemistry Text at 121-25.  For
example, the mirror image of a right hand is not another right
hand but a left hand.  <u>Id.</u>

[9].  Not all enantiomers have such disparate effects on the human
body.  <u>See</u>, <u>e.g.</u>, <u>New Jersey v. Cathcart</u>, 589 A.2d 193, 198 (N.J.
App. Div. 1991) (discussing the similar effects of D- and L-
cocaine); <u>United States v. Puglisi</u>, 790 F.2d 240, 242 (2d Cir.)
(same), <u>cert. denied</u>, 479 U.S. 827 (1986); <u>United States v.</u>
<u>Bockius</u>, 564 F.2d 1193, 1195 (5th Cir. 1977) (same); <u>United</u>
<u>States v. Orzechowski</u>, 547 F.2d. 978, 985 (7th Cir. 1976) (same),
<u>cert. denied</u>, 431 U.S. 906 (1977).

Methamphetamine exists in these two isomeric forms.[10] L-methamphetamine is a compound that produces little or no physiological effect when ingested.  Carroll, 6 F.3d at 743. D-methamphetamine, on the other hand, produces the physiological effect desired by its users.  Id.

The text of U.S.S.G. § 2D1.1 differentiates only between methamphetamine and methamphetamine (actual).  We have previously discussed that distinction as it involves drug purity, not organic structure.  The question now posed is whether the isometric structure of methamphetamine, as well as the net quantity of methamphetamine hydrochloride, is relevant to Guidelines sentencing.  The Guidelines do not differentiate between the D- and L- isomers of methamphetamine in the text of section 2D1.1, but only in the commentary to it.  There, in the Drug Equivalency Tables, L-methamphetamine is treated far less severely than either methamphetamine or methamphetamine (actual): methamphetamine (actual) by a factor of 250, methamphetamine by a factor of 25.  See U.S.S.G. § 2D1.1 comment.(n.10) (Drug Equivalency Table) (one gram of L-methamphetamine is equivalent to 40 grams of marijuana, one gram of methamphetamine is equivalent to one kilogram of marijuana, and one kilogram of

_____

[10].  The Eleventh Circuit, in United States v. Carroll, 6 F.3d 735, 743 (11th Cir. 1993), described a third form of methamphetamine: DL-methamphetamine.  Standard texts, however, seem to recognize only two chemical forms of methamphetamine with DL-methamphetamine merely being a combination of the two forms. See Organic Chemistry Text at 127 (defining a racemic mixture as "a 50:50 mixture of enantiomers").  Our analysis would be unaffected if a third form does exist.

methamphetamine (actual) is equivalent to 10 kilograms of marijuana).[11] With this chemical background in mind, we consider first whether the issue raised by this distinction in their physiological effect was fairly raised before the district court. Bogusz and O'Rourke never used precise chemical terms in arguing this question. They lumped this issue together with their arguments on purity when they objected to sentencing based upon an unanalyzed substance. Nevertheless, we conclude that Bogusz's and O'Rourke's objections to sentencing based on the unanalyzed substance produced at the methamphetamine laboratory fairly raised and preserved the issue for appeal.

Even if Bogusz and O'Rourke were raising the issue for the first time on appeal, we could nevertheless review the trial court's findings for plain error. See Fed. R. Crim. P. 52(b) ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."). We believe that under these circumstances the district court's interpretation of the Guidelines would be plain error. Because of the objections at sentencing, this case differs factually from United States v. Peninno, 29 F.3d 572, 580 (11th Cir. 1994), in which the United States Court of Appeals for the Eleventh Circuit refused to consider a similar claim because of

_____

[11]. The Drug Equivalency Tables are generally used only when a controlled substance is not listed in the Drug Quantity Table, U.S.S.G. § 2D1.1(c), or when it is necessary to combine different controlled substances. See U.S.S.G. § 2D1.1, comment.(n.10); cf. Ammar, 714 F.2d at 263 (upholding heroin conspiracy conviction without distinguishing between D- and L- isomers because statute did not distinguish them).

the appellant's complete failure to object at sentencing. Moreover, considering the gross disparity in sentencing, we disagree with the Peninno court's holding that the determination of methamphetamine type is entirely a factual question that cannot rise to the level of plain error. Id.

The Fifth Circuit recently defined a plain error as one "so obvious that [a] failure to notice it would seriously affect the fairness, integrity, or public reputation of the judicial proceeding and result in a miscarriage of justice." United States v. Hoster, 988 F.2d 1374, 1380 (5th Cir. 1993) (quoting United States v. Surasky, 974 F.2d 19, 21 (5th Cir. 1992), cert. denied, 113 S. Ct 1948 (1993)); see also United States v. Olano, 113 S. Ct. 1770, 1776 (1993). We recognize that the term "plain error" normally implies an error that is apparent as well as unjust. See United States v. Atkinson, 297 U.S. 157, 160 (1936).[12] Here, however, we think that the egregiousness of the

---

[12]. Rule 56 is sometimes said to require a plain error to be an obvious error. See United States v. Blythe, 944 F.2d 356, 359 (7th Cir. 1991) (relying exclusively on Justice Scalia's dissenting opinion in Pretez v. United States, 111 S. Ct. 2661, 2678 (1991)). The Supreme Court, however, has defined plain errors as errors that "are obvious, or [that] otherwise seriously affect the fairness, integrity or public reputation of the judicial proceedings." Atkinson, 297 U.S. at 160. In United States v. Olano, 113 S. Ct. 1770 (1993), the Supreme Court, discussing Rule 52(b), stated that appellate review is available only when: (1) there is an error; (2) the error is "plain;" and (3) the error affects substantial rights. Id. at 1776-77. "Plain is synonymous with clear or, equivalently, obvious. . . . At a minimum, the Court of Appeals cannot correct an error pursuant to Rule 52(b) unless the error is clear under current law." Id. at 1777 (internal citations and quotations omitted). Though the present error was not obvious, we think it was clear; thus, even if Bogusz's and O'Rourke's failure to appreciate the technical chemical basis for their objection was a waiver, we

injustice that would result if the distinction between the two isomers is not recognized outweighs the failure of Bogusz and O'Rourke to articulate clearly the principles of organic chemistry that underlie their objections to the district court's application of the Guidelines.[13]

Thus, considering the magnitude of the difference in sentencing that could result from the application of the wrong organic isomer, we think the sentencing court's failure to make this determination would result in a grave miscarriage of justice.[14] We will thus consider whether the distinction between

(..continued)
think the requirements of Rule 52(b) would be met because of the great difference in the effect of the two substances that the commentary to U.S.S.G. § 2D1.1(c) recognizes when it distinguishes them by a conversion factor of 250 to 1.

[13]. Moreover, a sentencing scheme that imposes the same penalty on a person who produces a compound with little or no effect as a person who produces a potent mind-altering drug would seem irrational. When interpreting the Guidelines, we apply traditional canons of statutory construction. Thus, we will not interpret the Guidelines in a manner that leads to irrational results when alternative interpretations consistent with the objectives of the Sentencing Reform Act are available. See, e.g., Griffin v. Oceanic Contractors Inc., 458 U.S. 564, 575 (1982). The Sentencing Reform Act intended to create "an effective, fair sentencing system." U.S.S.G. Ch. 1, Pt. A intro. comment. "To achieve this end, . . . Congress sought proportionality in sentencing through a system that imposes appropriately different sentences for criminal conduct of differing severity." Id.

[14]. Because the Guidelines' confusing textual use of the term "actual" and its unexplained distinction between the two isomers in the commentary's reference to the equivalency table, we cannot criticize the district court for failing to appreciate this problem. Some commentators suggest that lawyers generally possess "an appalling degree of scientific illiteracy, which ill equips them to educate and guide the bench." Andre A. Moenssens et al., Scientific Evidence in Criminal Cases 7 (3d ed. 1986)

the left- and right-handed isomers of methamphetamine is material to the Guidelines sentences that can be legally imposed on Bogusz and O'Rourke.

In United States v. Carroll, 6 F.3d 735 (11th Cir. 1993), the Court of Appeals for the Eleventh Circuit sought to separate methamphetamine's purity from the effect of its isomers. In that case, the defendant's sentence was based on methamphetamine that contained 50% D- and 50% L-methamphetamine. Id. at 743.  The Court of Appeals held, "the distinction between methamphetamine and [methamphetamine (actual)] refers to the relative purity of any methamphetamine compound; it does not refer to a particular form of methamphetamine."  Id. at 744. Thus, the 50% D- and 50% L-methamphetamine compound could be 100% pure for purposes of calculating methamphetamine (actual).  Judge Bright dissented from the majority's "drug quality issue."  Id. at 747.  Because the Guidelines "caused great confusion due to the convoluted chemical rhetoric" required by their application in this area, Judge Bright would have affirmed the lower court's conclusion that purity should be based on the quantity of D-methamphetamine.  Id. at 749.[15]

An isolated literal reading of U.S.S.G. § 2D1.1(c) does offer some support to the Carroll majority's separation of the

(..continued)
(discussing the difficulties experienced by judges in determining the admissibility of expert evidence).

[15].  Judge Bright lamented the complexity and confusion apparent in the Guidelines' treatment of methamphetamine.  Carroll, 6 F.3d at 749 (Bright, J., dissenting).  We add our voice to his lament.

purity problem from the difference in the effect of the two
isomers.  We think, however, that such a separation for purposes
of Guidelines' sentences would obliterate the distinction between
the effect of the two isomers that the Guidelines' commentary
recognizes in any case in which the Drug Equivalency Tables are
not used.  Considering the difference between the physiological
effect of the two isomers, along with the Sentencing Commission's
recognition of that difference in its use of conversion factors
with a 1 to 250 ratio, the disparity in sentencing that would
result seems to us contrary to one of Congress's primary goals in
passing the Sentencing Reform Act--the substitution of uniformity
for disparity in sentencing.[16]  We think the Guidelines should
not be construed in a way that results in so greatly irrational a
disparity.  To illustrate, under Carroll, a defendant convicted
of one gram of pure L-methamphetamine would have a base offense
level of 16 with a Guidelines range of 21 to 27 months
imprisonment.  See U.S.S.G. Ch. 5, Pt. A (Sentencing Table)
(assuming a criminal history category of I).  Another defendant
sentenced for one gram of pure L-methamphetamine and an
additional 200 grams of marijuana (thus, requiring conversion
under the Drug Equivalency Table) would have a base offense level
of 6 and a sentencing range of zero to six months.  See U.S.S.G.

---

[16].  The Sentencing Reform Act of 1984 sought to achieve
"reasonable uniformity in sentencing by narrowing the wide
disparity in sentences imposed for similar criminal offenses
committed by similar offenders."  U.S.S.G. Ch. 1, Pt. A, intro.
comment.

Ch. 5, Pt. A (Sentencing Table) (again, assuming a criminal history category of I).

Accordingly, we hold that the references to methamphetamine and methamphetamine (actual) in the Drug Quantity Tables of U.S.S.G. § 2D1.1(c) refer solely to quantities of D-methamphetamine. In order to calculate a base offense level under section 2D1.1(c) for L-methamphetamine, the substance in question must first be converted into marijuana equivalents. See U.S.S.G. § 2D1.1, comment.(n.10) (noting that the Drug Quantity Tables do not include all substances and that the Drug Equivalency Tables should be used for those that are not included).

Because no determination of the isomeric composition of methamphetamine was made at sentencing, this issue must also be considered on remand. We again remind the government that it has the burden of production and persuasion on this issue and that the proper standard for the burden of persuasion is a preponderance of the evidence. The type of proof required to satisfy this standard will also vary from case to case.[17] In

---

[17]. See United States v. Lande, No. 94-8038, 1994 WL 627425, at *1-2 (10th Cir. Nov. 9, 1994) (affirming a district court's finding of D-methamphetamine based upon circumstantial evidence); United States v. Wessels, 12 F.3d 746, 754 (8th Cir. 1993) (reversing a district court for taking judicial notice that methamphetamine was D-methamphetamine), cert. denied, 115 S. Ct. 105 (1994); Patrick, 983 F.2d at 210 (requiring the government to prove that conviction was based upon D-methamphetamine). We do not think that this standard will create either an insurmountable burden or a meaningless hurdle for the government but, rather, merely recognizes the distinctions between the organic compositions and purity levels of methamphetamine the Guidelines require. We think some evidence of the quantity of each isomer

some cases, the evidence will include a chemical analysis or expert testimony.  In others, circumstantial evidence of which isomer is present may be sufficient to meet the preponderance of the evidence standard.  See United States v. Koonce, 884 F.2d 349, 352-53 (8th Cir. 1989) (affirming D-methamphetamine determination based on circumstantial evidence of defendant's prior methamphetamine shipment).

B.  Section 2D1.11's Cross Reference to 2D1.1

Bogusz alone raises the next Guidelines issue.  He argues that the district court erred in applying U.S.S.G. § 2D1.1 under section 2D1.11's cross-reference to it.  He contends that section 2D1.1 does not apply to violations of 21 U.S.C.A. § 841(d).  Bogusz pled guilty to distribution of a precursor chemical knowing that it would be used to manufacture a controlled substance but was sentenced for conspiracy to unlawfully manufacture the quantity of the controlled substance that was produced from the precursor chemicals he delivered.

(..continued)
is needed because Congress and the Sentencing Commission deemed methamphetamine different enough to warrant this unique sentencing scheme.  The inapplicability of the prohibition against hearsay to sentencing proceedings, see United States v. Sciarrino, 884 F.2d 95, 96 (3d Cir.), cert. denied, 493 U.S. 997 (1989), should facilitate the production of evidence in the form of expert opinion.  Moreover, we do not think precise quantitative analysis of the product should be required, only some reasonable estimate of the relative amounts of each isomer, perhaps inferred from the production method and results generally obtained in laboratory experiments using normal production methods.

Bogusz relies primarily on United States v. Voss, 956 F.2d 1007 (10th Cir. 1992), a case decided under the Guidelines in effect before the amendment adopting section 2D1.11. In Voss, over a strong dissent by Judge Ebel, the court held U.S.S.G. § 2D1.1 inapplicable to violations of 21 U.S.C.A. § 841(d). Id. at 1012. The majority reasoned that its application "would insure that almost all violators of section 841(d) would be sentenced to the ten year maximum imprisonment, thus turning a statutory maximum into a mandatory sentence." Id. at 1010 (citations omitted). The majority refused to interpret the Guidelines in a manner that would achieve this result, fearing that such an interpretation "would effectively nullify the various sections of the Guidelines geared to a particular defendant's offense specific conduct." Id.

Since Voss, the Guidelines have been amended and section 2D1.11 now clearly applies to violations of section 21 U.S.C.A. § 841(d). See U.S.S.G. § 2D1.11 (Unlawfully Distributing, Importing, Exporting or Possessing a Listed Chemical; Attempt or Conspiracy). We sympathize with the concern the Voss majority expressed,[18] but we cannot reconcile it with

---

[18]. The Voss majority also expressed concern over treating section 841(d) violators the same as actual drug manufacturers. The Guidelines, as amended since Voss, cross reference to section 2D1.1 only when the "offense involved unlawfully manufacturing or attempting to manufacture a controlled substance . . . ." U.S.S.G. § 2D1.11(c)(1). Section 841(d) can be violated by conduct not meeting this requirement. Therefore, we do not believe that the Sentencing Commission acted irrationally by equating the penalties for these offenses. In fact, the theory behind all inchoate penalties is based on some belief in equivalent culpability.

the text of the amended Guidelines.  See United States v. O'Leary, 35 F.3d 153, 154 (5th Cir. 1994).  Section 2D1.11(c)(1) states:  "If the offense involved unlawfully manufacturing a controlled substance, or attempting to manufacture a controlled substance unlawfully, apply § 2D1.1 (Unlawful Manufacturing, Importing, Exporting, Trafficking) if the resulting offense level is greater than that determined above."  U.S.S.G. § 2D1.11(c)(1). The Guidelines explain that section 2D1.11(c)(1) applies when "the defendant, or a person for whose conduct the defendant is accountable under § 1B1.3 (Relevant Conduct), completed the actions sufficient to constitute the offense of unlawfully manufacturing a controlled substance or attempting to manufacture a controlled substance unlawfully."  Id. § 2D1.11, comment.(n.2). The relevant conduct referred to in section 1B1.3 includes "all acts . . . committed, aided, abetted, counselled, commanded, induced, procured, or willfully caused by the defendant; and in the case of a jointly undertaken criminal activity . . . all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity."  Id. § 1B1.3(a)(1)(A & B).

Unless there is a showing of contrary intent, we must "follow the clear unambiguous language of the Guidelines." United States v. Wong, 3 F.3d 667, 670 (3d Cir. 1993). Therefore, we apply the Guidelines as they were written, not as we think they should have been written.  Id.  The district court had before it sufficient evidence to determine that Bogusz's conduct satisfied the requirements of U.S.S.G. § 2D1.11(c)(1).

Accordingly, we hold that the district court did not err in its reliance on section 2D1.1 by cross-reference from section 2D1.11.

However, the use of section 2D1.11 requires us to consider a constitutional issue. If the Voss majority's interpretation of the pre-1991 Guidelines was correct, Bogusz's sentence would conflict with the Ex Post Facto Clause. U.S. Const. art. I, § 9, cl. 3. The prohibition against the passage of ex post facto laws includes, inter alia, "[e]very law that changes the punishment and inflicts a greater punishment than it was when committed." Calder v. Bull, 3 Dall. 386, 390 (1798). In Miller v. Florida, 482 U.S. 423 (1987), the Supreme Court, in striking down the use of a state sentencing guideline, held that an application of a sentencing provision to conduct occurring before its passage or promulgation violates the Ex Post Facto Clause whenever "the law [is] retrospective, that is, it . . . appl[ies] to events occurring before its enactment, and . . . it . . . disadvantage[s] the offender affected by it." Id. at 430 (internal quotations and citations omitted).

Bogusz was sentenced under the 1991 Guidelines for conduct that occurred from early April to early May 1990. The 1991 Guidelines became effective November 1, 1991. Therefore, if the 1990 Guidelines would have resulted in a lower sentence, the Ex Post Facto Clause would require its application. See United States v. Spiropoulos, 976 F.2d 155, 160 n.3 (3d Cir. 1992) ("district courts are required to apply the time-of-offense [G]uidelines rather than the time-of-sentence [G]uidelines when . . . the time-of-offense [G]uidelines are more favorable to the

defendant").  Thus, if the Voss interpretation of the earlier Guidelines were correct, Bogusz could have received a less severe sentence under the pre-1991 revision of the Guidelines.  See Voss, 956 F.2d at 1013 (district court should base sentencing on the purposes of 18 U.S.C.A. § 3553(b) (1988) without regard to the Guidelines' sentencing table).

The Ex Post Facto Clause requires us to interpret the pre-1991 Guidelines and meet the question posed by Voss, one this Court has not previously decided under the pre-1991 Guidelines.  After thorough consideration, we find ourselves in agreement with those courts that have rejected the view of the Voss majority.[19]  Following Judge Ebel's reasoning in dissent, we hold that, under the pre-1991 Guidelines, violators of 21 U.S.C.A. § 841(d) could properly be sentenced under U.S.S.G. § 2D1.1.  Accordingly, we conclude that application of the 1991 Guidelines did not disadvantage Bogusz and thus no constitutional infirmity exists under the Ex Post Facto Clause.

## C.  Bogusz's Plea Bargain

---

[19].  See United States v. Leed, 981 F.2d 202, 207 (5th Cir.), cert. denied, 113 S. Ct. 2971 (1993); United States v. Cook, 938 F.2d 149 (9th Cir. 1991); United States v. Kingston, 922 F.2d 1234 (6th Cir. 1990), cert. denied, 500 U.S. 933 (1991); see also United States v. Perrone, 936 F.2d 1403, 1416-17 (2d Cir. 1991) (allowing application of U.S.S.G. § 2D1.1 for 21 U.S.C.A. violations only when the defendant knew or could reasonably foresee the manufacturing quantity on which sentencing is based).  But see United States v. Hyde, 977 F.2d 1436, 1441 (11th Cir. 1992), cert. denied, 113 S. Ct. 1948 (1993).

Finally, Bogusz argues that the government violated the terms of his plea bargain by arguing for affirmance of the district court's sentence in this appeal.[20]

In the plea bargain agreement between Bogusz and the government, the parties stipulated that the base offense level would be 24 under U.S.S.G. § 2D1.11(d)(3). The probation office, in Bogusz's PSR, considered and rejected application of section 2D1.11(d)(3) and instead recommended application of section 2D1.11(c)(1) which, by cross-reference, requires the application of section 2D1.1. The district court's decision to accept the PSR recommendation raised Bogusz's base offense level to 34. Bogusz does not appeal the district court's refusal to honor the stipulation, however. See United States v. Torres, 926 F.2d 321 (3d Cir. 1991) (allowing the sentencing judge to consider evidence outside the stipulation but requiring an opportunity for plea withdrawal); United States v. Wagner, 994 F.2d 1467, 1475 (10th Cir. 1993) ("It is well settled the terms of a plea agreement are not binding on the sentencing court.").

In Santobello v. New York, 404 U.S. 257 (1971), the Supreme Court held that plea bargains are governed by the law of contracts and, therefore, the parties' must strictly adhere to

---

[20]. The government argues that Bogusz raised this issue for the first time in his reply brief. In response, the government filed a motion to strike this argument or, in the alternative, for leave to file a surreply brief. We denied these motions. We do not usually consider questions first raised in this manner. Here, however, the issue Bogusz raises became apparent only after the government filed its brief. Accordingly, Bogusz had no opportunity to raise it before he filed his reply brief.

their promises.  United States v. Badaracco, 954 F.2d 928, 939 (3d Cir. 1992); United States v. Hayes, 946 F.2d 230, 233 (3d Cir. 1991).  Courts use a three-step analysis to review plea bargains:  first, they determine the agreement's terms and the conduct alleged to violate it; second, they determine if the conduct violated the plea agreement; and third, if the plea agreement is violated, they determine the remedy.  Hayes, 946 F.2d at 233 (quoting United States v. Moscahlaidis, 868 F.2d 1357, 1360 (3d Cir. 1989)).  Here, the terms of the plea bargain are clear.  Therefore, we focus on the second step.  Determining whether the government's conduct violated the plea agreement is a question of law over which we have plenary review.  Id.

The stipulations attached to the plea bargain between Bogusz and the government state that "the applicable federal sentencing guideline is section 2D1.11(3) carrying a base offense level of 24."  The government argues that the district court was correct in sentencing Bogusz based on methamphetamine (actual) as opposed to methamphetamine.  Brief of Appellee at 41-49.  Bogusz claims that the government's presentation of this argument violates the plea agreement.

Bogusz's plea agreement did not explicitly address the post-conviction conduct of either party.  See, e.g., United States v. Gonzalez, 981 F.2d 1037 (9th Cir. 1992) (plea agreement with a no-appeal clause).  Nevertheless, because "the government cannot resort to a rigidly literal approach in the construction of language," we are not limited to the express language of the agreement.  Badaracco, 954 F.2d at 939 (quoting United States v.

Crusco, 536 F.2d 21 (3d Cir. 1976)). Rather, "[i]n determining whether the terms of a plea agreement have been violated, the court must determine whether the government's conduct is inconsistent with what was reasonably understood by the defendant when entering the plea of guilty." Id. (quoting United States v. Nelson, 837 F.2d 1519, 1521-22 (11th Cir.), cert. denied sub nom. Waldhart v. United States, 488 U.S. 829 (1988)).

A reasonable person in Bogusz's position may have understood the stipulation to include an agreement not to argue against the stipulation on appeal. Cf. Moore v. Foti, 546 F.2d 67, 68 (5th Cir. 1977) (defendants "successful challenge to his plea bargained sentence is a tacit repudiation of the bargain"). Bogusz, however, did not appeal the district court's refusal to follow the stipulation.

Moreover, the government does not directly argue against the stipulation; instead, it contends only that the district court's definition of methamphetamine (actual) is correct. This issue is separate and distinct from the stipulation. Similarly, Bogusz has not breached his plea agreement by arguing directly for his own interpretation of methamphetamine after he had stipulated to an unrelated Guidelines' provision. Our adversarial system of justice relies heavily on the presentation of opposing views by both parties, on appeal as well as at trial. Thus, we are reluctant to deny any party the right to advance its interpretation of law. Under the circumstances before us, we hold that the government did not

violate the letter or the spirit of the plea agreement by its arguments on this appeal.

## IV.  Conclusion

For the reasons discussed above, the sentences imposed on Bogusz and O'Rourke will be vacated and their cases remanded for resentencing in a manner consistent with this opinion.  In all other respects, the orders of the district court are affirmed.

<u>U.S. v. Bogusz and O'Rourke</u>, Nos. 92-5575 and 92-5595


NYGAARD, <u>Circuit Judge</u>, concurring and dissenting.

I join in all parts of the majority's opinion except for part III(A)(1).  Because I believe the majority has adopted the wrong test for determining the purity of methamphetamine, I respectfully dissent from that portion of its opinion.

As the majority recognizes, the Sentencing Guidelines provide two ways for sentencing a defendant convicted of unlawfully manufacturing methamphetamine.  Under U.S.S.G. § 2D1.1(c) cmt. * (1991), the court first looks to the "the entire weight of any mixture or substance containing a detectable amount of the controlled substance."  Next, the court is instructed to determine the weight of the pure form of the controlled substance contained within the mixture, otherwise known as "methamphetamine (actual)."  These weights are then translated into offense levels by use of the Drug Quantity Table, and the higher of the two offense levels is used in determining the appropriate sentence.

The issue here is how much methamphetamine (actual) was contained in the substance manufactured by the defendants.  Appellants contend that methamphetamine (actual) means only the amount of <u>pure</u> methamphetamine, free of all impurities, while the government argues that any <u>uncut</u> substance containing methamphetamine is methamphetamine (actual), regardless of its purity.  The majority, while acknowledging that both views are supported in the caselaw, concludes that "methamphetamine (actual) refers to the net amount of methamphetamine

hydrochloride produced and not the gross amount of uncut methamphetamine."  Majority transcript at 12.

I disagree with this conclusion.  Precursor chemicals used in the manufacture of methamphetamine cost money and may be difficult to obtain.  Consequently, it is counterintuitive to conclude that every rational "cook" would not seek the highest possible yield of methamphetamine hydrochloride from those chemicals.  The mere fact that the cook bungles the recipe and produces a sticky, caramel-like substance of low purity, which no user wishes to purchase, should not diminish punishment vis-a-vis the "good" cook whose product is more pure and highly salable.

Moreover, the majority's holding also places an unwarranted burden upon the government to obtain an enhanced sentence based on the amount of methamphetamine (actual).  Under the majority's rule, the government must now have every sample of methamphetamine analyzed and its purity determined; the mere fact that the drug is uncut is no longer sufficient.  First, we must recognize that criminal defendants who operate "meth cooks" in garages, barns and, as here, basements, are not scientists who sit around discussing the molecular structure of their creations.  Bogusz was a mechanic who got the phenylacetic acid for the "cook" and O'Rourke was a truck driver who cleaned out the drains at the "cook."  Second, "meth" is not produced under laboratory conditions and is almost never pure.  Third, in cases like this one, where the specific batch of drugs at issue is never

recovered and tested, the defendant will avoid an enhanced sentence altogether, even when it is undisputed that the drugs were uncut.

I would simply avoid these problems altogether and hold that methamphetamine (actual) refers to the uncut output of the manufacturing process, regardless of its purity.  See United States v. Macklin, 927 F.2d 1272, 1283 (2d Cir.), cert. denied, 112 S. Ct. 146 (1991).  I therefore respectfully dissent.