Ainsworth v. Edda Cantor Commissioner CV-99-447-M    02/03/00

**UNITED STATES DISTRICT COURT FOR THE**
**DISTRICT OF NEW HAMPSHIRE**


Wayne Ainsworth, et al.


    v.                                    Civil No. 99-447-M
                                          Opinion No. 2000 DNH 036

Edda Cantor, Acting Commissioner
N.H. Dept. of Corrections, et al.


**REPORT AND RECOMMENDATION**

Plaintiffs are 23 inmates at the New Hampshire State Prison who brought this action seeking review of the prison's sexual offender rehabilitative programs, which they claim deprive them of their right against self-incrimination in violation of the Fifth Amendment.  They moved for a preliminary injunction, which was referred to me for a recommendation of disposition.  See 28 U.S.C. § 636(b)(1)(B).  An evidentiary hearing was held on December 22, 1999, at which four plaintiffs and four prison officials testified.  After carefully considering the evidence and legal arguments submitted by both sides, for the reasons set forth below, I recommend that the motion for preliminary

injunction (documents no. 5), and the amended petition for injunctive relief (document no. 13), be granted.

## Discussion

### 1. Background

Plaintiffs are all convicted sexual offenders. As part of its rehabilitation programs, the New Hampshire State Prison ("NHSP") offers two sexual offender programs, an "Intensive Sexual Offender Program" and an "Enhanced Relapse Prevention Program." See Plaintiffs' Exhibit 1, NHSP Sexual Offender Programs manual. The manual explains "[t]he major difference between the two programs are quantitative, not qualitative," as "the basic admission criteria, program objectives and goals and completion requirements are the same for both [programs]." Id. at 10. Accordingly, I will refer to both programs by the single acronym, the "SOP."

Most convicted sexual offenders are required to successfully complete the SOP before being considered for parole. Those sexual offenders who participate do so because participation was

2

required as part of the sentence imposed, or it was recommended by a prison official, or it could lead to a reduced sentence or earlier release on parole. Not all those recommended for the program, however, actually complete it. There are more inmates who need the SOP than it can accommodate. As a result, admission to the program is selective.

Admission to the SOP follows a set procedure. The inmate must initiate the process, by requesting programming with his correctional counselor or case manager. See id. at 3. The counselor then submits a referral form to the program coordinator, who enters the information received into a sexual offender data base which tracks all referred offenders. See id. When the inmate is within two years of his minimum parole date, he is interviewed to determine whether he meets the program's eligibility requirements. Those eligibility requirements include, among other things, that the inmate "admits offending [conduct] which is consistent with victim reports." See id., "Selection Criteria." If he satisfies the other remaining criteria, generally the inmate will be assigned to either SOP

3

program depending on his treatment needs.  See id.

Evidence elicited at the hearing demonstrated that inmates are not admitted to the SOP if they refuse to accept responsibility not only for the offense[s] for which they were convicted, but also for any other reported offenses.[1]  Plaintiff Donald Carter testified that he has been denied admission because he refuses to admit to sexually assaulting a daughter named Kelly.  This testimony was substantiated by the prison's response to his third request for admission, when Lance Messinger, the director of the SOP, replied to Carter, "Are you now willing to admit your offending against Kelly?"  Plaintiff's Exhibit 5.  Another plaintiff, Carl Graf, testified that he has been denied admission to the SOP because he refuses to accept responsibility for the offense which led to his incarceration.  He had testified at his trial that he was not guilty of the charges lodged against

_____

[1]The program anticipates offenders will admit to their entire deviant sexual history, whether or not known to prison officials; however, if specific offenses have been reported by victims and are, therefore, known by the prison, the evidence showed that, at a minimum, the NHSP required the offender to acknowledge that particular behavior.

4

him, and his conviction is on appeal; however, if he participates in the SOP he could get two years taken off his minimum sentence. The remaining two plaintiffs who testified, Wayne Ainsworth and Kevin Badger, have been denied access to the SOP because each refuses to admit guilt of their crimes of conviction because each of them claims to be innocent.

Once in the program, continued acceptance of responsibility for past sexual misconduct is expected of the inmate. Messinger testified that being "open and honest" about past deviant sexual conduct was a critical component of rehabilitation. See e.g., id. at 9 (listing among the criteria for program completion acceptance of "full responsibility . . . for offending without minimizing or blaming others"). In Phase I of the SOP, clinical group therapy requires participants to provide "full and open disclosure, sexual autobiography, contributing factors in offending." Id. at 5. These disclosures, however, are not protected by any grant of immunity or assurance of confidentiality. The SOP "Treatment Contract," id. at 12, specifically provides for the participant to agree to sign an

5

"Acknowledgment of Confidentiality" waiver.

Messinger testified that although he is concerned about how the program affects inmates' right against self-incrimination, he does not have the authority to immunize his patients from potential criminal liability for admissions made in the program. Evidence elicited at the hearing demonstrated that at least one participant was prosecuted for an offense admitted during treatment. Messinger explained that he has a duty to report uncharged offenses learned of during treatment and, although he tries to arrange for immunity, the decision whether to pursue charges lies with the appropriate prosecuting authorities.

John Eckart, the executive assistant to the N.H. Adult Parole Board, testified that among the factors considered by the Parole Board is whether the inmate has completed the SOP and that, as a general rule, a sexual offender will not be considered for parole unless he has completed the SOP. A few sexual offenders, however, are released without having completed the SOP

while incarcerated, but only about two or three annually.[2]  Other

sexual offenders are paroled without completing the SOP if they

were not designated to receive the institutional program, but

those parolees receive community based sexual offender

rehabilitation programming.[3]

Finally, the evidence showed that prisoners at the NHSP are

moved from one building to another for a variety of reasons,

including as incentive for desired behavior and as punishment for

aberrant behavior.  Although plaintiffs claim they are punished

for not participating in the SOP by being moved from "South"

building, a desired housing location, to "Hancock" or "H"

building, a less desirable alternative, the evidence failed to

substantiate that contention.  Both buildings are medium security

housing units, although the testimony consistently described

South as the preferred housing assignment because of its

---

[2]Eckart testified that between 55-75 sexual offenders have
been paroled annually since 1996.

[3]In fact, the one inmate Eckart spoke of who had just been
released without completing the SOP was required to participate
in a community based sexual offender rehabilitation program.

7

accommodating features. The NHSP generally tries to move sexual offenders into South as an incentive to participate in the SOP, and when such moves are made others are transferred out of South who have not cooperated with the prison's rehabilitation efforts. The evidence demonstrated that most of the prison's sexual offender population is housed in South, but sexual offenders are dispersed throughout the institution. Testimony at the hearing suggested the NHSP had a policy of transferring uncooperative sexual offenders from South to Hancock if they refused to participate in the SOP, but, of the plaintiffs, only Ainsworth has actually been moved, and it was unclear whether his transfer was pursuant to that policy. The other plaintiffs who testified had not been moved because of their nonparticipation in the SOP.[4]

## 2. Standard of Review

Whether a preliminary injunction should be issued depends on the plaintiffs' showing of (1) their likelihood of success on the merits of their claims, (2) the potential for irreparable harm if

---

[4]Badger and Graf testified they were still housed in South; Carter has been housed in Hancock since he was first incarcerated in 1998.

the injunction is denied, (3) the balance of hardship to the plaintiffs if the injunction is denied compared to the defendant's hardship if it is granted, and (4) the effect, if any, of the court's decision on the public interest.  See Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 15 (1st Cir. 1996).  "Likelihood of success is the main bearing wall of the four-factor framework."  Id. at 16 (citing precedent).  As a result, if plaintiffs are unable to convince the court that they are likely to succeed on the merits, they will not obtain the injunction sought.  See Weaver v. Henderson, 984 F.2d 11, 12 (1st Cir. 1993) (explaining how likelihood of success is the "sine qua non" of the preliminary injunction analysis).

In this action, plaintiffs pursue the single issue of whether the SOP's "open and honest" requirement violates the Fifth Amendment by causing them to potentially incriminate themselves.  Plaintiffs are not contending that they have any liberty interest in parole or in being considered for parole, or any liberty interest in being housed in a particular building at the NHSP.  Instead, they weave those issues into their Fifth

9

Amendment claim.  They assert the SOP policy of requiring each

participant to admit to past deviant sexual conduct before

admission into or successful completion of the program exposes

them to potential future criminal liability.  They further

contend that the NHSP practice of not considering them for parole

and moving them out of favorable housing conditions into more

restrictive environments if they refuse to participate in the SOP

are sufficiently coercive responses to their decision not to make

certain admissions to constitute the compulsion element of a

Fifth Amendment violation.  The success of plaintiffs' Fifth

Amendment claim turns on this narrow issue, of whether the

prison's response to plaintiffs' refusal to make the self-

incriminating admissions constitutes compulsion.

**(a) The Merits of Plaintiffs' Claims.**

The Fifth Amendment of the U.S. Constitution, which applies

to the States through the Fourteenth Amendment, see Allen v.

Illinois, 478 U.S. 364, 368 (1986), provides "No person . . .

shall be compelled in any criminal case to be a witness against

himself . . .."  The privilege extends not just "to answers that

10

would in themselves support a conviction . . . but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute the claimant. . .." Hoffman v. United States, 341 U.S. 479, 486 (1951) (discussing the scope of the privilege asserted before a federal grand jury). It is well-settled that the privilege

> "not only permits a person to refuse to testify against himself at a criminal trial in which he is a defendant, but also 'privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings.'"

Allen, 478 U.S. at 368 (quoting Supreme Court precedent). The privilege extends to convicted inmates to protect them from being compelled to make incriminating statements regarding any crime other than that for which they have been convicted. See Minnesota v. Murphy, 465 U.S. 420, 426 (1984) (discussing the scope of the Fifth Amendment privilege probationers enjoy); see also U.S. v. Perez-Franco, 873 F.2d 455, 462 (1st Cir. 1989) (explaining how defendants who plead guilty are still protected by the privilege for other crimes that are not part of the

11

agreement); Lile v. McKune, 24 F. Supp. 2d 1152, 1156 (D. Kan.
1998) (citing Baxter v. Palmigiano, 425 U.S. 308 (1976) to extend
the privilege to inmates).

The Fifth Amendment problem in this case arises out of the
SOP policy of requiring participants to admit to their deviant
sexual history.  This policy would violate the Fifth Amendment
if:  (1) the SOP program is considered a "proceeding," within the
meaning of the Fifth Amendment; (2) if the answers sought are
self-incriminating; and (3) if the answers are in some way
compelled by the government.  The first two elements of a Fifth
Amendment claim are readily satisfied based on the facts before
the court; the third element, that of compulsion, however, is
more problematic.  Each element is discussed below in turn.

As part of its selection process and treatment program, the
SOP requires inmates to admit to and accept responsibility for
all prior deviant sexual behavior, including unreported or
uncharged offenses.  Because the SOP is a structured
rehabilitation program with very specific admission procedures,
selection criteria, and treatment goals and objectives to

12

achieve, see e.g. Plaintiffs' Exhibit 1, I believe it falls within the meaning of an informal administrative proceeding, see Allen, 478 U.S. at 368, for purposes of this Fifth Amendment analysis. See Perez-Franco, 873 F.2d at 462 (applying the privilege to an interview with a probation officer conducted as part of a pre-sentence report and explaining that the privilege depends on the incriminating nature of the answers sought, not on the nature of the proceeding in which the questions are asked).

Likewise, the requirement that all participants "admit[] offending [conduct] which is consistent with victim reports," Plaintiff's Exhibit 1 at 3, with no grant of immunity or guarantee of confidentiality, is patently self-incriminating. The evidence was clear and consistent that an inmate would have to be "open and honest" about his entire history of sexual misconduct, including uncharged or unreported deviant behavior. See e.g. id. at 5 (describing group therapy in phase I of the program as requiring "full and open disclosure, sexual autobiography"), 12 (the SOP Treatment Contract's first condition requires the participant to "agree to be complete[ly] open and

13

honest and assume full responsibility for [his] offenses and [his] behavior."). The evidence also clearly and consistently showed that such admissions could and would be used against the inmate in future criminal proceedings. See e.g. id. at 12, Treatment Contract, waiver of confidentiality provision. Messinger testified that although he has sought immunity for SOP participants, he has been unable to guarantee such protection, that he has a duty to report disclosures made in the SOP, and that the prosecuting authorities determine whether to pursue charges. Clearly, then, with respect to conduct of which they have not been convicted, the inmates are required to incriminate themselves within the meaning of the Fifth Amendment. See Hoffman, 341 U.S. at 486-87 (explaining that the privilege may be asserted whenever it is "evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result."); see also Allen, 478 U.S. at 368 (citing precedent to demonstrate the Supreme Court's well-settled holding that the

14

privilege affords protection where answers might lead to future criminal proceedings).

The third and final component of a Fifth Amendment violation, that such self-incriminating statements are compelled by the government, is the critical element of plaintiffs' claim. There is no dispute that participation in the SOP is entirely voluntary, even if it is recommended by the NHSP or as part of a sentence, because refusal to participate merely results in the inmate serving the full sentence originally imposed. The resolution of this case turns on whether there is any compulsion in this voluntary program.

Compulsion has been found where the government threatens "'potent sanctions,'" Lile, 24 F. Supp. 2d at 1158, or some other penalty if the answers sought are not provided. See Perez-Franco, 873 F.2d at 462-63 (discussing cases where the Supreme Court has found a Fifth Amendment violation because of the threatened or imposed penalty for failing to answer). An answer is not voluntarily given if it is given only to avoid a penalty, because that denies the individual a "'free choice to admit, to

15

deny or to refuse to answer.'" Minnesota v. Murphy, 465 U.S. at 429.

> In each of the so-called "penalty" cases, the State not only compelled an individual to appear and testify, but also sought to induce him to forgo the Fifth Amendment privilege by threatening to impose economic or other sanctions "capable of forcing the self-incrimination which the Amendment forbids." In most of the cases, the attempt to override the witnesses' privilege proved unsuccessful, and the Court ruled that the State could not constitutionally make good on its prior threat. These cases make clear that "a State may not impose substantial penalties because a witness elects to exercise his Fifth Amendment right not to give incriminating testimony against himself."

Id. at 434 (citations omitted). Thus, if a substantial penalty is likely to result for failing to respond to the question asked, the incriminating disclosure is considered compelled, even if it was voluntarily given. See Perez-Franco, 873 F.2d at 462.

Plaintiffs argue here that the NHSP in fact compels the self-incriminating statements by (i) conditioning consideration for parole on successful completion of the SOP and (ii) transferring inmates to less desirable housing if they refuse to make the admissions and participate in the SOP. Their housing

16

argument may be summarily dismissed, because it is well-settled that inmates have no constitutional right to any specific housing in any particular institution. See Olim v. Wakinekona, 461 U.S. 238, 244 (1983) (citing Meachum v. Fano, 427 U.S. 215 (1976) and Montanye v. Haymes, 427 U.S. 236 (1976) to support the conclusion that prisoners have no liberty interest protecting them from either intrastate or interstate transfers); see also State v. Peabody, 121 N.H. 1075, 1078-79, 438 A.2d 305 (1981) (explaining that the warden determines the "terms, conditions, and place of incarceration once a person has been sentenced to the New Hampshire State Prison").

Moreover, the evidence was consistent that the minimal transfers which have been made have been to housing at the same custody classification. There was no evidence of punitive transfers having been made as a result of any refusal to admit prior sexual misconduct. While one prison building may be more accommodating than another, absent any evidence of a punitive transfer into a higher security level unit, the housing decisions appear to be "'within the normal limits or range of custody which

17

the conviction has authorized the State to impose.'" Olim, 461 U.S. at 246-47 (quoting Meachum, 427 U.S. at 225). Accordingly, I find plaintiffs have failed to demonstrate that any transfers, or threat of transfers, of sexual offenders have imposed a "penalty" which could be understood as compelling them to provide the self-incriminating statements required by the SOP to establish a Fifth Amendment violation.

On the other hand, the allegation that plaintiffs are denied consideration for parole is a more onerous response. New Hampshire law reflects a clear policy to release inmates on parole as "a means of supervising and rehabilitating offenders without continued incarceration and a means by which prisoners can be aided in the transition from prison to society." N.H. Rev. Stat. Ann. ("RSA") 651-A:1 (1996). It is well-settled, however, that release on parole is considered a privilege within the discretion of the state adult parole board, not a right prisoners can expect to have protected. See e.g. Baker v. Cunningham, 128 N.H. 374, 380-81, 513 A.2d 956 (1986)(holding New Hampshire law does not create a constitutional or statutory right

18

to parole); see also Bussiere v. Cunningham, 132 N.H. 747, 752-52, 571 A.2d 908 (1990) (explaining how the parole board rules do not limit the board's discretion to give rise to a protected liberty interest in parole).  Yet what is at issue here is not the right to be released on parole, but the right to be considered for parole.  If plaintiffs have some right to be considered for parole, which the NHSP deprives them of when they refuse to provide the details of their deviant sexual history, then the NHSP has created the classic "penalty" situation which denies plaintiffs of "'the free choice to admit, to deny, or to refuse to answer,'" Perez-Franco, 873 F.2d at 462, that violates the Fifth Amendment.

Under New Hampshire law, a prisoner

> may be released on parole upon the expiration of the minimum term of his sentence, minus any credits received pursuant to RSA 651-A:23, plus the disciplinary period added to such minimum under RSA 651:2, II-e, any part of which is not reduced for good conduct as provided in RSA 651-A:22, provided that there shall appear to the adult parole board, after having given the notice required . . . to be a reasonable probability that he will remain at liberty without violating the law and will conduct himself as a good citizen.

19

RSA 651-A:6, I (1996).  This provision also addresses when inmates serving multiple sentences may first be considered for parole.  See RSA 651-A:6, II.  These statutes create an expectation that any inmate will be considered for, not released on, parole approximately two years before the completion of his minimum sentence, adjusted to account for his prison record.[5]  Thus while the right to parole must be earned and is a privilege, see e.g. Bussiere, 132 N.H. at 753, eligibility for parole arises automatically with the passage of time.  See RSA 651-A:6, I.  And yet, under the current system, plaintiffs are not considered for parole unless they are willing to make incriminating admissions, even though they are statutorily eligible to be considered for release on parole.

All four plaintiffs who testified at the hearing stated that

---

[5]This expectation is bolstered by the parole board's practice of, in fact, usually considering sexual offenders for parole approximately two years before the minimum release date based on their sentence.  See e.g. Plaintiff's Exhibit 1 at 3 ("When an inmate is within two years of his MPD (Minimum Parole Date) or possible parole date as determined by possible sentence reduction, then an interview will be set up to determine whether or not an offender meets the program eligibility requirements.").

they had been denied admission to the SOP because of their refusal to admit to specific criminal conduct, and none of them has been considered for parole.[6] The New Hampshire Supreme Court addressed a challenge to the SOP like that asserted here in Knowles v. Warden, 140 N.H. 387, 666 A.2d 972 (1995). The Court held that the SOP admission policy did not violate the Fifth Amendment because the inmate's freedom to choose not to admit his guilt or not to participate in the SOP eliminated the element of "compulsion" needed for a Fifth Amendment violation. "The plaintiff's refusal to admit guilt will not cause him to serve additional prison time; he simply may be required to serve the sentence he received originally." Id. at 393. In distinguishing a case which found a Fifth Amendment violation where probation was revoked for failing to admit guilt of the crime of conviction, the Court concluded that a decision to deny parole was qualitatively different from a decision to revoke parole once

_____

[6]Carter and Graf testified that if they successfully complete the SOP, not only could they be considered for parole, but they could petition the court for, in Carter's case, a suspension, and in Graf's case, a reduction, of their sentences.

21

granted, since the inmate's interest in parole before release is merely a hope.  Id.

While that analysis could dispose of the present claim, the facts in Knowles, at least as presented by the Court, are distinguishable.  First and most significantly, the plaintiff there refused only to accept responsibility for the crimes of which he had been convicted.  See id. at 388; see also Brooker v. Warden, No. 98-466-JD, slip op. at 12-13 (D.N.H. June 22, 1999) (dismissing similar Fifth Amendment challenge to the SOP admissions policy where the plaintiff was "not compelled to make statements about other criminal acts"); Knowles v. Cunningham, No. 96-228-JD, slip op. at 7-8 (D.N.H. Jan. 24, 1997) (similar unsuccessful challenge where petitioner was required to admit guilt as to only the conduct for which he was convicted).  Since the plaintiffs' conviction extinguishes their right against self-incrimination regarding the acts for which they were convicted, see Reina v. United States, 364 U.S. 507, 513 (1960); United States v. Johnson, 488 F.2d 1206, 1209 (1st Cir. 1973) ("conviction, of course, removed any claim of privilege based

22

upon liability for that offense"); see also United States v.

Albert, 773 F.2d 386, 389 (1st Cir. 1985) (affirming assertion of

privilege not for the crime to which witness pled guilty but to

protect testimony that could lead to other charges), the problem

arises with the requirement to admit to as yet uncharged crimes.

See id.; see also Johnson, 488 F.2d at 1209-10 (explaining that

conviction of one crime does not "erase[] the privilege as it

relates to others").

Based on the record before the court, one inmate was

required to do just that and was prosecuted based on his

admissions, and plaintiff Carter has been expected to admit to

criminal conduct his daughter Kelly has reported.[7]  Carter has

---

[7]The remaining three plaintiffs who testified, Ainsworth, Badger and Graf, refused to accept responsibility for the crimes for which they were convicted.  Because their right against self-incrimination with respect to that conduct was extinguished by their convictions, see Reina, 364 U.S. at 513, they do not have a Fifth Amendment claim based on the current record of just that criminal conduct.  Graf, however, testified that because his conviction is on appeal, and he took the stand during his trial and denied his guilt, he would not admit to it now.  Clearly such an admission would create the risk of perjury charges based on his trial testimony.  Moreover, there are 19 other plaintiffs in this action; what their individual circumstances are regarding their sexual history is not yet in evidence.  Messinger's

been denied admission to the SOP apparently only because he refuses to admit to the conduct Kelly has reported.  Yet he testified that if he were to complete the SOP, the remainder of his sentence would be suspended.  Thus his refusal to admit his guilt with respect to Kelly, not with respect to the other victims for whom he was convicted, is penalizing him by eliminating his ability to have the remainder of his sentence suspended.  By contrast to the plaintiff in Knowles, here the plaintiffs seek protection for admissions regarding unreported and uncharged crimes.

Second, the Court summarized one of the SOP objective's as requiring "self-disclosure of the inmates entire sexual offending history."  Id.; see also Knowles, No. 96-228-JD, slip op. at 3 n.1 (finding that disclosure of sexual history was an objective of the SOP, not a criterion for admission to it).  The evidence at the hearing consistently demonstrated that the SOP required

---

testimony substantiated plaintiffs' allegation that they are required to admit to conduct which, as yet, may not have been reported, let alone charged against them.  The potential for self-incrimination, therefore, is real.

24

the offenders to admit openly their sexual autobiography, as part of the admission procedure and group therapy.  Messinger clearly testified that offenders were required to be "open and honest," which meant specific admissions which could be, and in fact have been, used against inmates in other criminal proceedings.  These facts were not before the New Hampshire Supreme Court when it determined that the SOP policy, as applied to the plaintiff there, did not compel incriminating answers.  Accordingly, I am not persuaded that the result in Knowles disposes of the issue presented here.

The facts here demonstrate that sexual offenders may not be considered for parole if they have not completed the SOP or, in other words, have not made potentially incriminating admissions about other crimes they committed in the past.  Although Eckart testified that in a few exceptional cases sexual offenders have been released without completing the SOP, the evidence supported the general rule that sexual offenders must complete the SOP before the parole board will even consider whether release on

25

parole would be appropriate.[8]  A policy of denying consideration for parole if an offender asserts his Fifth Amendment right may be inferred from the parole board's practice, even though it is not explicit in the parole statute or rules.  See Minnesota v. Murphy, 465 U.S. at 435 (holding that the State there could have created the "classic penalty situation" "if [it], either expressly or by implication, asserts that invocation of the privilege would lead to revocation of probation").

In other "penalty" cases, the loss, or threatened loss, of a job, or other economic hardship has constituted a sufficient sanction to find compulsion on the part of the government.  See e.g. Minnesota v. Murphy, 465 U.S. at 434-35 (citing cases); Garrity v. New Jersey, 385 U.S. 493 (1967) (threatened discharge from employment for failing to provide the incriminating answers sought constituted compulsion); Uniformed Sanitation Men v. Commissioner of Sanitation, 392 U.S. 280, 284 (1968) (same);

---

[8]Plaintiffs Graf and Carter are faced not just with the loss of consideration for parole, but also with the loss of a right to petition the court for a reduction and suspension of their respective sentences.

Perez-Franco, 873 F.2d at 462-63 (summarizing Supreme Court precedent as settling "'that government cannot penalize assertion of the constitutional privilege against compelled self-incrimination by imposing sanctions to compel testimony which has not been immunized.'" (quoting Lefkowitz v. Cunningham, 431 U.S. 801, 806 (1977)). Also, refusing to give credit for a statutory sentence reduction where the defendant accepted responsibility for only one count of a multi-count indictment has been held to impose a penalty in violation of the Fifth Amendment. See id. at 463-65; see also United States v. Corbin, 988 F.2d 1377, 1389-90 (7th Cir. 1993) (noting a split among the courts of appeals and citing cases consistent with Perez-Franco's holding).

The evidence presented in support of this preliminary injunction motion showed that plaintiffs were not considered for parole because of their refusal to abide by the SOP admissions policy, despite any statutory eligibility for parole consideration. If potential economic losses or longer sentences create penalties which are substantial enough to satisfy the compulsion element of a Fifth Amendment violation, then the loss

27

of the right to be considered for parole, or to be considered for a reduction or suspension of one's sentence, would appear to be at least as onerous of a sanction.  See Perez-Franco, 873 F.2d at 463 (finding "imprisonment is one of a wide variety of penalties which can serve to trigger a constitutional violation"); Lile, 24 F. Supp. 2d at 1158-59 (holding loss of privileges and transfers to maximum custody were sufficiently penalizing to compel self-incriminating admissions); cf. Minnesota v. Murphy, 465 U.S. at 435-37 (finding no Fifth Amendment violation because the probationer was not faced with a choice between remaining silent and having his probation revoked or incriminating himself).[9]

---

[9]I reach this conclusion even in light of the Supreme Court's recent decision in Ohio Adult Parole Authority v. Woodward, __ U.S. __, 118 S. Ct. 1244 (1998).  In Woodward, the Court held Ohio's clemency procedure did not violate the Fifth Amendment, because the challenged clemency interview was voluntary.  Although the inmate was facing death and was not guaranteed immunity for any answers provided during the interview, the Court found no compulsion because any "undoubted pressures – generated by the strength of the Government's case against him - pushing the criminal defendant to [be interviewed]" did not constitute "compulsion" for Fifth Amendment purposes. Id. at 1253.  The Court concluded that "this pressure to speak in the hope of improving his chance of being granted clemency does not make the interview compelled." Id.  In Woodward, the inmate's refusal to be interviewed, however, did not eliminate

While ultimate success on the merits is far from certain, I find at this preliminary stage of the proceedings that plaintiffs are likely to prevail on the merits of their claim with respect to denial of consideration for parole. In other cases where no Fifth Amendment violation has been found despite the elicitation of self-incriminating answers, generally immunity has been provided by the government. See e.g. Allen, 478 U.S. at 367-68 (holding Illinois' requirement that sexual offenders submit to compulsory examinations under its "Sexually Dangerous Persons

_____

his right to a clemency hearing before the parole board, a clemency recommendation to the governor by the parole board, or a final decision by the governor on the clemency issue. He, therefore, was not faced with the choice between self-incrimination or loss of his life, as some courts have found, see e.g. Searcy v. Simmons, 68 F.Supp.2d 1197, 1201 (D.Kan. 1999) (holding that if the choice in Woodward between self-incrimination or loss of life was not sufficient compulsion to render the answers involuntary, then the choice between loss of privileges or self-incrimination cannot be compulsion under the Fifth Amendment), because his right and ability to be considered for clemency remained intact. By contrast, in the instant case plaintiffs' refusal to answer eliminates, for all practical purposes, any chance of being considered for release on parole or having a sentence reduced or suspended. I, therefore, still conclude at this preliminary stage in the proceedings based on that evidence which is currently before the court, that the NHSP has created a substantial penalty which compels the answers sought.

29

Act" does not violate the Fifth Amendment because the proceedings are civil and the answers provided could not be used against the offender in any subsequent criminal proceeding); Neal v. Shimoda, 131 F.3d 818, 833 (9th Cir. 1997) (finding no Fifth Amendment violation despite the compelled incriminating answers because any admission made could not be used against the plaintiffs); Grand Jury Subpoenas v. United States, 40 F.3d 1096, 1101-03 (allowing the grand jury to consider compelled statements as long as they are not the basis of future criminal prosecution against the speaker)(10th Cir. 1994); see generally Kastigar v. United States, 406 U.S. 441, 448 (1972) (affirming the constitutionality of immunity statutes which enable the government to obtain incriminating answers in return for immunity from prosecution based on those answers); Minnesota v. Murphy, 465 U.S. at 435 n.7 ("Our cases indicate, moreover, that a State may validly insist on answers to even incriminating questions and hence sensibly administer its probation system, as long as it recognizes that the required answers may not be used in a criminal proceeding and thus eliminates the threat of incrimination."). A similar

30

accommodation for plaintiffs here would appear to reasonably balance the State's interest in successfully rehabilitating sexual offenders with the plaintiffs' Fifth Amendment rights.[10]

### (2) The Remaining Factors.

The remaining factors tip the scales in favor of granting a preliminary injunction. The loss of liberty which would result from a future criminal conviction for conduct admitted to in the course of the SOP would harm the plaintiff in a manner which could not be redressed with money damages. More importantly, however, both the balancing of the equities factor and the public interest factor weigh heavily towards granting the injunction sought. The evidence showed that successful rehabilitation requires inmates to admit their deviant sexual histories, and

---

[10]For a discussion of efforts which have been made to balance the conflict between the State's interest in rehabilitation and public safety and the plaintiffs' interest in not incriminating themselves, see Scott Michael Solkoff, Note, *Judicial Use Immunity and the Privilege against Self-Incrimination in Court Mandated Therapy Programs*, 17 Nova L. Rev. 1441 (1993). Significantly, protecting plaintiffs from future prosecution based on admissions made during rehabilitation would not prevent the government from prosecuting a plaintiff based on evidence independently obtained. See id. at 1490.

31

successful rehabilitation reduces the recidivism rate by as much as 50%. It is clearly in the public's interest to have these plaintiffs rehabilitated, yet the current SOP admissions policy has repelled them and has created a situation in which sexual offenders may complete their sentences and be entitled to release from incarceration without getting the mental health care so critical to the public safety. Under such circumstances and based on the current record, I find that the four factors relevant to the determination of whether or not a preliminary injunction should be granted favor granting an injunction.

## Conclusion

Accordingly, for the reasons set forth above, I recommend that the plaintiffs' request for a preliminary injunction be granted, but only as follows: defendants are enjoined from conditioning admission to the SOP upon an admission by plaintiffs to uncharged criminal conduct, unless plaintiffs are immunized from use in any way of those admissions in any subsequent criminal proceedings. This recommendation is only for a preliminary injunction, which means that, if accepted, it will be

32

effective only for the duration of this lawsuit until the issues raised herein may be disposed of finally.

Any objections to this Report and Recommendation must be filed within ten (10) days of receipt of this notice.  Failure to file objections within the specified time waives the right to appeal the district court's order.  See <u>Unauthorized Practice of</u>

Law Committee v. Gordon, 979 F.2d 11, 13-14 (1st Cir. 1992);

United States v. Valecia-Copete, 792 F.2d 4, 6 (1st Cir. 1986).

_____
James R. Muirhead
United States Magistrate Judge

Date: February 3, 2000

cc: Michael J. Sheehan, Esq.
    New Hampshire Dept. of Justice
      Daniel J. Mullen, Esq.